UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CLERK
US DISTRICT &
BANKRUPTCY COURTS

20 MAY 28  P 5: 23

RECEIVED

# FILED

**MAY 2 8 2010**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

————————————————————————

DANIEL PARISI,
1465 Route 23
Wayne, NJ 07470,

WHITEHOUSE.COM INC.,
1465 Route 23
Wayne, NJ 07470,

WHITEHOUSE NETWORK LLC,
1465 Route 23
Wayne, NJ 07470, and

WHITE HOUSE COMMUNICATIONS INC.,
PTY 4684, BOX 0843-03073
Balboa, Ancon 0000 Panama,

Plaintiffs,

v.

LAWRENCE W. SINCLAIR a/k/a "Larry Sinclair",
9 Spring Drive
Port Orange, FL 32129,

JEFFREY RENSE,
1680 Ashland Street
Ashland, OR 97520,

BARNES & NOBLE, INC.,
122 Fifth Avenue
New York, NY 10011,

BARNESANDNOBLE.COM LLC,
76 Ninth Avenue
New York, NY 10011,

AMAZON.COM, INC.,
410 Terry Avenue
Seattle, WA 98109,

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No.

**COMPLAINT AND JURY
DEMAND**

Case: 1:10-cv-00897
Assigned To : Leon, Richard J.
Assign. Date : 5/28/2010
Description: PI/Malpractice

JURY ACTION

BOOKS-A-MILLION, INC.,                              )
402 Industrial Lane                                )
Birmingham, AL 35211, and                          )
                                                   )
SINCLAIR PUBLISHING, INC.,                         )
9 Spring Drive                                     )
Port Orange, FL 32129,                             )
                                                   )
                         Defendants.               )
_____ )

Plaintiffs, Daniel Parisi, Whitehouse.com Inc., Whitehouse Network LLC, and White House Communications Inc. (collectively referred to as "plaintiffs"), by counsel, files this complaint against defendants, Lawrence W. Sinclair, Jeffrey Rense, Sinclair Publishing, Inc., Barnes & Noble, Inc., Barnesandnoble.com LLC, Amazon.com, Inc., and Books-A-Million, Inc. (collectively referred to as "defendants"), and alleges as follows:

## PARTIES

1.      Plaintiff, Daniel Parisi ("Parisi"), is a citizen of New Jersey.

2.      Plaintiff, Whitehouse.com Inc., is a New Jersey corporation with its principal place of business in Wayne, New Jersey.

3.      Plaintiff, Whitehouse Network LLC ("WN"), is a New Jersey corporation with its principal place of business in Wayne, New Jersey.

4.      Plaintiff, White House Communications Inc. ("WHCI"), is a Panama corporation with its principal place of business in Panama.

5.      Defendant, Lawrence W. Sinclair a/k/a "Larry Sinclair" ("Sinclair"), is a citizen of Florida.

6.      Defendant, Jeffrey Rense ("Rense"), is a citizen of Oregon.

7.    Defendant, Barnes & Noble, Inc. is a Delaware corporation, with its principal place of business in New York, New York. B&N is registered to do business in the District of Columbia and has one or more retail stores in this District.

8.    Defendant, Barnesandnoble.com LLC, is a Delaware limited liability corporation, with its principal place of business in New York, New York.

9.    Barnes & Noble, Inc. and Barnesandnoble.com LLC are hereinafter referred to as "B&N".

10.   Defendant, Amazon.com, Inc. ("Amazon"), is a Delaware corporation, with its principal place of business in Seattle, Washington.

11.   Defendant, Books-A-Million, Inc. ("BAM"), is a Delaware corporation, with its principal place of business in Birmingham, Alabama.  BAM is registered to do business in the District of Columbia and has one or more retail stores in this District.

12.   Defendant, Sinclair Publishing, Inc. ("SPI"), is a Florida corporation, with its principal place of business in Port Orange, Florida.

## JURISDICTION AND VENUE

13.   Subject matter jurisdiction exists pursuant to 28 U.S.C. § 1332 in that plaintiffs and defendants are citizens of different states and the matter in dispute exceeds the sum or value of $75,000, exclusive of interests and costs.

14.   Personal jurisdiction over the defendants is proper in this District.  Defendants have continuous and systemic contacts with the District of Columbia and have been and are conducting and doing business in this District.  Personal jurisdiction also exists pursuant to D.C. Code § 13-423.

15.   Venue exists in this District pursuant to 28 U.S.C. §§ 1391(c).

## BACKGROUND

16.     Parisi is engaged in the business of owing and developing domain names and websites.

17.     WHCI owns the domain name, Whitehouse.com.  Whitehouse.com Inc. and WN operate the Whitehouse.com domain name and website.  They have been and are engaged in efforts to develop that website into a profitable business venture.  In 2008, efforts were underway to develop Whitehouse.com into a politically-oriented website.  Plaintiffs hoped to follow the model of successful political sites such as huffingtonpost.com, which in December 2008 raised $25 million in a single investment and a total valuation of almost $100 million, according to published reports.

18.     Sinclair is a self-confessed convicted felon and former drug user and trafficker. He has used multiple aliases.   He operates self-promotional websites, including larrysinclair.com, larrysinclair.org and larrysinclairforcongress.com.

19.     On February 10, 2007, then Senator Barack Obama ("Obama") announced that he was running for President of the United States.

20.     On January 3, 2008 Obama won the Iowa Democratic caucus.

21.     On or about January 18, 2008, Sinclair posted a YouTube video in which he made wild allegations regarding the purchase, sale and use of drugs and sexual activity by and between Sinclair and Obama on November 6 and 7, 1999.

22.     Sinclair hoped and expected to profit and personally benefit from his drug and sex allegations against the Presidential candidate.

23.     In or about February 2008, after he became aware of Sinclair's allegations and as part of its effort to develop a political website, Parisi contacted Sinclair.  He offered to pay Sinclair $10,000 to take polygraph examinations and to pay him $100,000 if the examinations

showed Sinclair was telling the truth.  Whitehouse.com, Inc. later paid Sinclair $20,000 by check as part of a modified agreement.

24.     On or about February 22, 2008, polygraph examinations of Sinclair were administered by Edward Gelb ("Gelb"), a certified polygraph examiner and past President of the American Polygraph Association and well known examiner, at his office in Los Angeles California.  Sinclair was involved with and agreed to the selection of Gelb.

25.     In Los Angles, Sinclair was interviewed for a few hours, which was videotaped.

26.     Gelb administered two polygraph examinations, one pertaining to the drug allegation and the other on the sex allegation.  Both examinations were videotaped.  According to Gelb's report, Sinclair indicated deception on both examinations, which was corroborated by a second examiner in his office.  These results were further corroborated on or about February 26, 2008, by a third party polygraph examiner, Gordon Barland.

27.     Whitehouse.com provided Sinclair with a copy of the polygraph examination results and posted the results online.

28.     Sinclair repeatedly represented to Parisi that he was going to identify and put Parisi and Whitehouse.com in touch with an alleged limousine  driver, who allegedly was with Sinclair and Obama when the alleged drug and sex acts occurred in 1999.  Despite his assurances, Sinclair never revealed the identity of the alleged driver to Parisi or Whitehouse.com or put them in contact with him.

29.     On or about March 13, 2008, Sinclair filed a complaint in this Court against four bloggers for defamation and "reckless misrepresentation", in an action captioned *Sinclair v. TubeSockTedD, et al.*, Civil Action No. 08-434-JDB.  The case was dismissed on February 10, 2009.

30.     On or about June 18, 2008, Sinclair held a press conference in the District of Columbia to repeat his drug and sex allegations and alleged that a church choir master, Donald Young, was murdered on December 23, 2007 and suggested that Obama or his campaign was somehow involved in the murder.  However, Sinclair did not mention the Young allegation during his hours long interview with Gelb or during the polygraph examinations.

31.     In June 2009, Sinclair self-published through SPI, a copyrighted book entitled *Barack Obama & Larry Sinclair: Cocaine, Sex, Lies & Murder?* (referred to as "the book" or "Sinclair's book"), which is incorporated herein by reference.

32.     Sinclair's book repeated his story about drugs, sexual activity and Donald Young's murder.  The book also contains vicious attacks on Parisi and Whitehouse.com. Sinclair's book is replete with false, defamatory and derogatory statements regarding Parisi and the website, including without limitation, the following:

> ▪     In fact, at 12:48 a.m. on February 25, 2008 (the day before Barland's review was even conducted), I received a telephone tip from 207-252-2796 and 207-899-0872, advising me that the polygraph was rigged and was arranged by Dan Parisi and Obama Campaign advisor David Axelrod.  The man giving me the tip stated that, "Axelrod and the Obama campaign had agreed to pay Dan Parisi of Whitehouse.com, $750,000 to arrange a rigged polygraph.  Parisi and Axelrod were in a heated argument because the Obama camp wanted Parisi to publish that you had failed the polygraph faster than what Parisi had said.  Parisi was refusing to publish anything further on the polygraph until he was paid the other half of the three-quarters of a million dollars agreed on."
>
> When I received this information, I contacted Dan Parisi and informed him of what was stated, and I asked Parisi to confirm or deny the allegations.  Instead of Parisi denying or confirming the allegations that he refused to respond to the statements and then posted a statement on Whitehouse.com that he had been threatened repeatedly by "Sinclair's supporters and that Whitehouse.com would not publish anything further regarding Larry Sinclair."  In addition, Parisi immediately shut down Whitehouse.com, completely scrubbed the site of all posts and comments on the Larry Sinclair/Barack Obama story, and revamped the format of

the website requiring individuals to register with Whitehouse.com before being able to comment. It was at that time, Whitehouse.com became the staunchest promoters of Barack Obama, while slamming Hillary Clinton non-stop. I also had asked Parisi to respond; I forwarded the information to Chicago Tribune reporter John Crewdson and asked him to look into who the tipster was. Crewdson actually spoke to the tipster and was told the same thing. In addition, the tipster stated that I should look very carefully at the FEC campaign finance reports for the period from January 1 through March 31, 2008 for the payments to Parisi. The tipster also advised me that Parisi had many different holding companies, and the Obama campaign would not have made a single individual payment.

Immediately after confronting Whitehouse.com's Dan Parisi about the allegations that he arranged a rigged polygraph exam, he issued a stop payment of the check issued to me for the polygraph exam. You see, Parisi had made a deal with David Axelrod and the Obama campaign. All of this occurred on the very day that I published emails to Mr. Parisi asking for his response to the claims made in an anonymous telephone tip.

- The information Edward Gelb had obtained from the extensive pre-polygraph interview suddenly was being posted on the internet at DemocraticUnderground.com, MyBarackObama.com, HuffingtonPost.com, and others. Only the information had been distorted and edited. In fact, it was after the rigged "polygraph/fishing expedition" arranged by Dan Parisi in a deal with advisor David Axelrod, that direct attacks began on the internet and by phone against my father's last wife, my nieces and nephews, my mother and my brothers and sisters.

- Finally, in February 2008 I was told anonymously that Dan Parisi of Whitehouse.com received $750,000 from the Obama campaign through AKR Media to organize an effort to publicly discredit me. When I confronted Parisi with this allegation, he did not deny it but instead withdrew the second exonerating polygraph report of Dr. Gordon Barland. He also failed to post the video of my polygraph as he and Whitehouse.com promised they would do. He even removed posts from their web site altogether, claiming that they had "had enough of the attacks by Sinclair's supporters and Sinclair himself."

- [T]he polygraph exam was announced by the internet pornography fraud Dan Parisi on Whitehouse.com . . . .

33.    Rense, who operates a website (rense.com) and has a nationwide radio show, wrote a foreword to Sinclair's book. The foreword contains false, defamatory and derogatory statements regarding the plaintiffs, including without limitation, the following:

> As soon as Larry Sinclair began to make 'noise' on the net and on my program, the Obama power base immediately organized a clearly high-level, multi-faceted assault on him featuring bizarre events like top advisor David Axelrod allegedly hiring internet porn merchant, Don Parisi, of the otherwise commercial porn site, Whitehouse.com, to set up an embarrassingly rigged polygraph 'examination' of Larry which he graciously made himself available for. The test, as you will read, was administered by the strange and rather shady Edward I. Gelb, polygraph examiner for hire, who among other things represented himself as having a Ph.D. when he apparently does not.

34.    Sinclair, B&N, Amazon, BAM, and SPI offer for sale and sell Sinclair's book throughout the United States, including in the District of Columbia, in stores and/or through internet order and delivery.

35.    In its "Product Description" of Sinclair's book, Amazon makes false and defamatory statements regarding plaintiffs, including without limitation, that: "You'll read how the Obama campaign used internet porn king Dan Parisi and Ph.D. fraud Edward I. Gelb to conduct a rigged polygraph exam in an attempt to make the Sinclair story go away. . . . This is a staggeringly true story of how the sitting U.S. President with the help of the Mainstream Media, the Chicago Police Department, the FBI, the Delaware Attorney General and others got away with murder and more. . . ." (*http://www.amazon.com/Barack-Obama-Larry-Sinclair-Cocaine/dp/0578013878/ref=sr_1_1?ie=UTF8&s=books&qid=1273680146&sr=1-1*; *see also* "From the Publisher" description).

36.    Amazon also offers for sale and sells a Kindle book reader edition of Sinclair's book. Amazon's "Product Description" for the Kindle edition falsely represents that the book is "100% true." It goes on to falsely state that: "You'll read how the Obama campaign used

internet porn king Dan Parisi and Ph.D. fraud Edward I. Gelb to conduct a rigged polygraph exam in an attempt to make the Sinclair story go away. . . .  This is a staggeringly true story of how the sitting U.S. President with the help of the Mainstream Media, the Chicago Police Department, the FBI, the Delaware Attorney General and others got away with murder and more . . . ."  Pursuant to ¶ 5.1.3 of its Digital Publication Distribution Agreement with authors, including Sinclair and/or SPI, Amazon is "entitled to determine what content we accept in and distribute through the Program in our sole discretion."  Pursuant to  ¶ 5.4.1, Amazon pays the author  a royalty  of 35% of the applicable list price for such digital book, net of certain expenses.

37.     Amazon also sells and offers to sell similar books in other countries, including the United Kingdom (through *www.amazon.co.uk*), Canada (through *www.amazon.co.ca*), Japan (through *www.amazon.co.jp*), France (through *www.amazon.co.fr*), and Germany (through *www.amazon.co.de*).

38.     BAM makes false and defamatory statements regarding plaintiffs, including without limitation, that:  "You'll read how the Obama campaign used internet porn king Dan Parisi and Ph.D. fraud Edward I. Gelb to conduct a rigged polygraph exam in an attempt to make the Sinclair story go away."   (*http://www.booksamillion.com/product/9780578013879?id= 4735050662228#*).

39.     B&N promoted the Sinclair book by publishing on its website a product description representing that "[y]ou'll read how the Obama campaign used internet porn king Dan Parisi and Ph.D. fraud Edward I. Gelb to conduct a rigged polygraph exam in an attempt to make the Sinclair story go away."  This affirmative act of publication is more than mere distribution.

40.    B&N has submission guidelines for the review and acceptance of new books.  In pertinent part, the guidelines state that:

> If you would like your title to be considered by our buyers, please submit a finished copy (no manuscripts please) of the book along with marketing and promotion plans, trade reviews, and a note describing how the book meets the competition (what makes it unique) to: [B&N] . . . . The information must include the ISBN and the suggested retail price. The review process takes about six weeks. . . .  All books will be considered for store placement based on subject matter and salability, provided the supplier submits a completed and signed Vendor Compliance Certification Form.

(Available at *http://www.barnesandnobleinc.com/for_publishers/How_to_Submit_a_Book/How_to_Submit_a_Book.html*).  In addition, B&N also has guidelines providing that:

> Why should Barnes & Noble place your title on its shelves?
>
> Tell us what makes your book unique or special. What is your marketing plan? Send us your publicity and promotional plans, along with any reviews or articles that may have been written about your book(s).

(*http://www.barnesandnobleinc.com/for_authors/how_to_work_with_bn/how_to_work_with_bn.html#isbn*).  Thus, had B&N following its own procedures for accepting books, it was or should have been aware of the contents of Sinclair's book before it was accepted, offered for sale, and sold.

41.    The above described Sinclair's book and promotional statements (referred to as "the defamatory statements") referred to Parisi and Whitehouse.com by name, were made of and concerning him and Whitehouse.com, and were so understood by those reading the defamatory statements.

42.    Third-parties have repeated and republished the defamatory statements orally and in writing.

43.    Since publication of the defamatory statements, defendants and others may have made other untrue statements of fact about the plaintiffs orally or in writing, including in postings on the internet, of which plaintiffs are not currently aware.

44.    The defamatory statements are false and misleading as they pertain to Parisi and Whitehouse.com.  The undisputable true facts are that, *inter alia*:

a.    Plaintiffs have never discussed Sinclair or his allegations with David Axelrod or the Obama campaign, or anyone acting on their behalf.

b.    Plaintiffs have never conspired, criminally or otherwise, with Obama, the Obama campaign or Axelrod or anyone acting on their behalf.

c.    Plaintiffs have never entered into an agreement, contract, or understanding with David Axelrod, the Obama campaign, or anyone acting on their behalf.

d.    Plaintiffs never agreed to accept or be paid money or other benefit by David Axelrod, the Obama campaign, or anyone acting on their behalf, for any purpose.

e.    Plaintiffs have never "made a deal with David Axelrod and the Obama campaign" for any purpose, including without limitation, to arrange a rigged polygraph examination of Sinclair.

f.    Plaintiffs did not "rig" Sinclair's polygraph examinations.

g.    Plaintiffs have never helped anyone to get away with murder.

h.    Parisi is not and has never been a pornographer.  He has not produced, created or made any pornographic material.

i.    During the relevant time period, Whitehouse.com did not contain pornographic material.

45.     The defamatory statements were made and published by defendants with knowledge of their falsity or with reckless disregard for their truth.  The defamatory statements were made without any evidence, direct or circumstantial, that they were true when made. Sinclair's book and the statements published by other defendants did not contain a scintilla of factual support for their wildly false and reckless untrue statements.

46.     The defendants have benefited and profited from Sinclair's book and the other defamatory statements.

47.     Prior to the filing of this action, defendants knew or had reason to know of the defamatory statements.

48.     As a direct and proximate result of the defamatory statements of the defendants, the Whitehouse.com website was shut down in 2008.  Whitehouse.com had hoped to sell the site to political/news entities, particularly during the historic 2008 presidential election year, but was unable to do so in light of the taint of Sinclair's defamation.  Plaintiffs have actual and special damages in the amount of at least $30,000,000.

49.     Prior to the filing of this action, B&N, Amazon, BAM and SPI were made aware of the alleged defamatory statements, but continue to publish, offer for sale and/or sell Sinclair's book.

50.     In fact, on May 28, 2010, Sinclair, responding to a case and desist letter on behalf of SPI, left plaintiffs' counsel the following voice message:

> Mr. Oparil, Lawrence Sinclair.  I received a FedEx letter from you dated May 27, 2010 addressed to Sinclair Publishing Inc. requesting that we cease and desist from publishing, offering for sale and selling a book titled "Barack Obama and Larry Sinclair: Cocaine, Sex, Lies and Murder?" which you claim that you represent Daniel Parisi and Dan Parisi claims that it's defamatory and disparaging.

> Here's my answer to your letter. HELL, NO. We will not cease
> and desist from publishing, offering for sale and selling the book,
> and I welcome Mr. Parisi to try to take legal action. Contracts that
> were drawn up between Mr. Parisi and myself and, uh -- well,
> you'll talk to your client. The answer is HELL, NO.

51.     On May 28, 2010, Sinclair sent a letter to plaintiffs' counsel confirming SPI would not cease and desist from publishing, offering for sale, and selling the book.

52.     The documents referred to in this complaint are incorporated herein by reference.

53.     Defendants are joint tortfeasors and are jointly and severally liable for the causes of action alleged herein.

## COUNT I
### (Libel *Per Se* / Libel)

54.     The foregoing allegations of the complaint are incorporated by reference.

55.     In or about June 2009, defendants published the defamatory statements in Sinclair's book and promotional statements.

56.     The defamatory statements referred to Parisi by name, were made of and concerning him, and were so understood by those reading the defamatory statements.

57.     The defamatory statements are false and misleading as they pertain to Parisi.

58.     The defamatory statements were made and published by defendants with knowledge of their falsity or with reckless disregard for their truth.

59.     The defamatory statements were so excessive, intemperate, unreasonable and abusive as to preclude any conclusion other than the defendants were actuated by actual malice.

60.     The defamatory statements are libelous on their face, in that they expose Parisi to hatred, contempt, ridicule and obloquy because they published statements that, *inter alia*, Parisi is a pornographer, criminally conspired with Axelrod and the Obama campaign, rigged

polygraph examination results, received improper funds from the Obama campaign or Axelrod, and assisted Obama to get away with murder.

61.    The defamatory statements have been available to, read or seen by members of the public, including without limitation, citizens of the District of Columbia.  The Sinclair book has been offered for sale and sold to the public, including without limitation, in the District of Columbia.

62.    The defamatory statements were not privileged and were published by the defendants with malice, hatred, contempt and ill will toward Parisi and with the desire to cause him economic injury, including lost business and opportunities.

63.    As a direct and proximate result of the foregoing, Parisi has suffered loss of reputation, shame, obloquy, mortification, as well as lost business and opportunities, in an amount to be proven at trial in excess of $30,000,000.

64.    Because of defendants' malice in publishing the defamatory statements, Parisi is entitled to an award of reasonable punitive damages in excess of treble the amount of compensatory damages.

## COUNT II
### (False Light Invasion/Misappropriation of Privacy)

65.    The foregoing allegations of the complaint are incorporated by reference.

66.    The published false defamatory statements concerning Parisi place him in a false light which would be highly offensive to a reasonable person.

67.    Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Parisi would be placed.

68.    Defendants have misappropriated Parisi's right to privacy.

69.    As a direct and proximate result of the foregoing, Parisi has suffered damages in an amount to be proven at trial in excess of $30,000,000.

### COUNT III
### (Business Disparagement)

70.    The foregoing allegations of this complaint are incorporated by reference.

71.    Defendants, and each of them, knowingly and intentionally published multiple defamatory written statements of fact to third persons, including, *inter alia*, that in 2008-09, Whitehouse.com contained pornography and engaged in unlawful and fraudulent conduct.

72.    At the time they made the defamatory statements, defendants, and each of them, had actual knowledge of the falsity of their statements and had actual serious doubts as to the truth of their statements, yet made the statements with knowledge of their falsity and in reckless disregard of their truth or falsity. Nevertheless, defendants made and disseminated their false statements to multiple third parties – including the general public through dissemination via the Internet and the press – in an effort to impugn the reputation of Whitehouse.com and its owners and management.

73.    The false and defamatory statements made by defendants were made with actual malice, and are therefore unprivileged.

74.    As a direct and proximate result of the foregoing, Whitehouse.com incurred damages, including special damages.

75.    As a direct and proximate result of defendants' wrongful conduct, Whitehouse.com is entitled to recover damages, in an amount to be determined at trial in excess of $30,000,000.

76.    Further, defendants' wrongful conduct and business disparagement was made with the intent to vex, injure and harm Whitehouse.com so as to constitute oppression, fraud and

malice justifying an award of exemplary and punitive damages in an amount to be determined at trial.

## COUNT IV
### (Tortious Interference with Economic Advantage)

77.    The foregoing allegations of this complaint are incorporated by reference.

78.    At all relevant time, Whitehouse.com had a valid business relationship or expectancy with respect to the website.

79.    Defendants had knowledge of such relationship or expectancy.

80.    Defendants intentionally interfered with the business relationship.

81.    As a direct and proximate result of defendants' wrongful conduct, Whitehouse.com is entitled to recover damages, in an amount to be determined at trial in excess of $30,000,000.

82.    Further, defendants' tortious interference was made with the intent to vex, injure and harm Whitehouse.com so as to constitute oppression, fraud and malice justifying an award of exemplary and punitive damages in an amount to be determined at trial.

## COUNT V
### (Civil Conspiracy)

83.    The foregoing allegations of this complaint are incorporated by reference.

84.    The defendants have combined and conspired for an unlawful purpose, *i.e.*, defamation, business disparagement and tortious interference with economic advantage, with the intent to injure plaintiffs.

85.    Defendants have done one or more overt acts in furtherance of their conspiracy.

86.    As a direct and proximate result of the civil conspiracy, plaintiffs have been injured by the defendants in an amount to be proven at trial, in excess of $30,000,000.

## DEMAND FOR RELIEF

WHEREFORE, plaintiffs request this Court to enter judgment in their favor and against defendants, awarding them the following relief:

a.      compensatory and consequential damages from defendants in an amount to be proven at trial but in excess of $30,000,000;

b.      punitive damages to the maximum amount permitted by law;

c.      an accounting and construction trust as to defendants' proceeds from the defamatory publications;

d.      attorneys' fees and expenses as allowed by law;

e.      costs; and

f.      such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand trial by jury as to all issues in this action triable of right by a jury.

Dated: May 28, 2010

Respectfully submitted,

Richard J. Oparil (D.C. Bar No. 409723)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (fax)

Attorneys for Plaintiffs

*Of Counsel:*

Kevin M. Bell (Bar No. 14382)
PATTON BOGGS LLP
8484 Westpark Drive
McLean, VA 22102
(703) 744-8000
(703) 744-8001 (fax)


5094034