## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL PARISI, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )   No. 1:10-cv-0897-RJL |
| | ) |
| LAWRENCE W. SINCLAIR a/k/a "Larry Sinclair", | ) |
| *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## PLAINTIFFS' OPPOSITION TO BOOKS-A-MILLION MOTION TO DISMISS

Richard J. Oparil (D.C. Bar No. 409723)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (fax)

Kevin M. Bell
PATTON BOGGS LLP
8484 Westpark Drive
McLean, VA 22102
(703) 744-8000
(703) 744-8001 (fax)

Dated:  August 25, 2010                    Attorneys for Plaintiffs

## <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................ 1

ARGUMENT .................................................................................................................... 8

I.      Plaintiffs Have Stated A Claim For Defamation And Related Torts Against BAM
        Based On Sinclair's Book. ................................................................................... 9

II.     Liability Based On BAM's Responsibility For The Defamatory Product
        Description It Used To Promote And Sell Sinclair's Book Is Not Barred By The
        Communications Decency Act. ........................................................................... 14

        A.      As An Initial Matter, BAM's Affirmative Defense Should Not Be
                Resolved On A Rule 12(b)(6) Motion To Dismiss For Failure To State A
                Claim. ...................................................................................................... 14

        B.      Plaintiffs Allege That BAM Is Responsible For The Defamatory Product
                Description. .............................................................................................. 17

        C.      BAM Adopted The Product Description As Its Own. ........................... 20

        D.      The CDA Does Not Bar Parisi's Right Of Publicity Claim. .................. 21

III.    Alternatively, Plaintiffs Should Be Granted Leave To File An Amended
        Complaint. ........................................................................................................... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Agere Sys. Guardian Corp. v. Proxim, Inc.*,
  190 F. Supp. 2d 726 (D. Del. 2002)....................................................................24

*Allison v. Vintage Sports Plaques*,
  136 F.3d 1443 (11th Cir. 1998) .........................................................................22

*Alvin v. Suzuki*,
  227 F.3d 107 (3d Cir. 2000).............................................................................24

*Anthony v. Yahoo, Inc.*,
  421 F. Supp. 2d 1257 (N.D. Cal. 2006) .............................................................20

*Atlantic Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009)...........................................................21, 22

*Brandewyne v. Author Solutions, Inc.*,
  Mem. Decision, Case No. 04-CV-4363 (18th Judicial Dist. Ct.,
  Kansas Aug. 3, 2006)......................................................................................13

*Church of Scientology. v. Minnesota State Med. Ass'n*,
  264 N.W.2d 152 (Minn. 1978).....................................................................10, 13

*Comedy III Prods., Inc. v. Gary Saderup, Inc.*,
  25 Cal.4th 387, 106 Cal. Rptr. 2d 126 (2001).....................................................22

*Conley v. Gibson*,
  355 U.S. 41 (1957)......................................................................................9, 16

*Curran v. Amazon.com, Inc.*,
  2008 U.S. Dist. LEXIS 12479 (S.D. W. Va. Feb. 19, 2008) ..................................12

*Doctor's Assocs. v. QIP Holders, LLC*,
  2007 U.S. Dist. LEXIS 28811 (D. Conn. Apr. 18, 2007)...........................15, 16, 19

*Doe v. Friendfinder Network, Inc.*,
  540 F. Supp. 2d 288 (D.N.H. 2008)...............................................................22, 23

*Doe v. GTE Corp.*,
  347 F.3d 655 (7th Cir. 2003) ...........................................................................15

*Donato v. Moldow*,
  374 N.J. Super. 475 (App. Div. 2005) ................................................................20

*Dworkin v. Hustler Magazine, Inc.*,
611 F. Supp. 781 (D. Wyo. 1985) ..................................................................................10

*Edwards v. City of Goldsboro*,
178 F.3d 231 (4th Cir. 1999) .......................................................................................24

*Erickson v. Pardus*,
551 U.S. 89 (2007) ........................................................................................................9

*ETW Corp. v. Jireh Publ'g, Inc.*,
332 F.3d 915 (6th Cir. 2003) .......................................................................................22

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*,
489 F.3d 921 (9th Cir. 2007) .......................................................................................19

*Foman v. Davis*,
371 U.S. 178 (1962) ....................................................................................................24

*FTC v. Accusearch, Inc.*,
2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sept. 28, 2007) ...........................................21

*Fuller v. Vines*,
36 F.3d 65 (9th Cir. 1994) ...........................................................................................24

*Gomez v. Toledo*,
446 U.S. 635 (1980) ....................................................................................................14

*Goodman v. Praxair, Inc.*,
494 F.3d 458 (4th Cir. 2007) .......................................................................................14

*Gucci Am., Inc. v. Hall & Assocs.*,
135 F. Supp. 2d 409 (S.D.N.Y. 2001) .........................................................................22

*Hartman v. Am. News Co.*,
171 F.2d 581 (7th Cir. 1948) .......................................................................................10

*Hill v. Brush Engineered Materials, Inc.*,
383 F. Supp. 2d 814 (D. Md. 2005) .............................................................................24

*Hill v. StubHub, Inc.*,
07-CVS-11310 (N.C. Super. Ct. Guilford County July 14, 2008) ...............................16

*Hy Cite Corp. v. badbusinessbureau.com, L.L.C.*,
418 F. Supp. 2d 1142 (D. Ariz. 2005) ....................................................................20, 21

*Janklow v. Viking Press*,
378 N.W.2d 875 (S.D. 1985) .......................................................................................10

*Johnson v. Buckley,*
    356 F.3d 1067 (9th Cir. 2004) ...................................................................................24

*Johnson v. Oroweat Foods Co.,*
    785 F.2d 503 (4th Cir. 1986) ....................................................................................24

*Lerman v. Chuckleberry Pub., Inc.,*
    521 F. Supp. 228 (S.D.N.Y. 1981)........................................................................10, 11

*Lewis v. Time Inc.,*
    83 F.R.D. 455 (E.D. Cal. 1979), *aff'd*, 710 F.2d 549 (9th Cir. 1983)....................10

*Novak v. Overture Services, Inc.,*
    309 F. Supp. 2d 446 (E.D.N.Y. 2004) ...................................................................15

*Osmond v. EWAP, Inc.,*
    153 Cal. App. 3d 842, 200 Cal. Rptr. 674 (1984) ..............................................10, 13

*Perfect 10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007) ...............................................................................22

*Philips Electronics N. Am. Corp. v. Hope,*
    631 F. Supp. 2d 705 (M.D.N.C. 2009) ..................................................................19

*Sabbato v. Hardy,*
    2000 Ohio App. LEXIS 6154 (Ohio Ct. App. Dec. 18, 2000)................................15

*Smith v. California,*
    361 U.S. 147 (1959).................................................................................................11

*Uhar & Co., Inc. v. Jacob,*
    2010 WL 1745134 (D.D.C. 2010) .........................................................................18

*United States v. Ramsey,*
    503 F. Supp. 2d 554 (N.D.N.Y. 2007)...................................................................19

*Universal Comm'n Sys., Inc. v. Lycos, Inc.,*
    478 F.3d 413 (1st Cir. 2007)...................................................................................21

*Villalovos v. Sundance Assocs., Inc.,*
    2003 U.S. Dist. LEXIS 387 (N.D. Ill. Jan. 13, 2003) ...........................................23

*Whitney Information Network, Inc. v. Xcentric Ventures, LLC,*
    2006 U.S. App. LEXIS 19518 (11th Cir. Aug. 1, 2006) ........................................18

*Zacchini v. Scripps-Howard Broad. Co.,*
    433 U.S. 562 (1977).................................................................................................22

<u>**Statutes**</u>

47 U.S.C. § 230 ................................................................................................................ passim

<u>**Rules**</u>

Federal Rule of Civil Procedure12(b)(6) ...................................................14, 15, 16, 23

Federal Rule of Civil Procedure 12(c) ..............................................................................15

Federal Rule of Civil Procedure 15(a) ..............................................................................24

Federal Rule of Civil Procedure 56 ..............................................................................15, 19

<u>**Other Authorities**</u>

4 J. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 28.1 (4th ed.
     2003) ..........................................................................................................................23

BLACK'S LAW DICTIONARY 813 (7th ed. 1999) ............................................................23

PROSSER AND KEETON ON THE LAW OF TORTS § 113 at 810 (5th ed. 1984) .................10

RESTATEMENT (SECOND) OF TORTS § 581 ........................................................9, 10, 13

RESTATEMENT (SECOND) OF TORTS § 652C................................................................23

Plaintiffs, Daniel Parisi ("Parisi"), Whitehouse.com Inc., Whitehouse Network LLC ("WNL"), and White House Communications Inc. ("WCI") (collectively referred to as "plaintiffs"), opposes the motion to dismiss filed by defendant Books-A-Million, Inc. ("BAM").

## **BACKGROUND**

On May 28, 2010, plaintiffs filed their complaint against defendants, Lawrence W. Sinclair ("Sinclair"), Jeffrey Rense ("Rense"), Sinclair Publishing, Inc. ("SPI"), Barnes & Noble, Inc. and Barnesandnoble.com LLC ("B&N"), Amazon.com, Inc. ("Amazon"), and BAM. (Dkt. No. 1).

According to the complaint, Parisi is engaged in the business of owning and developing domain names and websites. (Dkt. No. 1 ¶ 16). WCI owns the domain name whitehouse.com. Whitehouse.com Inc. and WNL operate the whitehouse.com domain name and website. They have been and are engaged in efforts to develop that website into a profitable business venture. In 2008, efforts were underway to develop Whitehouse.com into a politically-oriented website. Plaintiffs hoped to follow the model of successful political sites such as huffingtonpost.com, which in December 2008 raised $25 million in a single investment and a total valuation of almost $100 million, according to published reports. (*Id.* ¶ 17).

Unfortunately, that business plan was disrupted by plaintiffs; involvement with defendant Sinclair, a self-confessed convicted felon and former drug user and trafficker. (*Id.* ¶ 18; Declaration of Richard J. Oparil ("Oparil Decl.") Ex. 1). Sinclair has used multiple aliases. He operates self-promotional websites, including larrysinclair.com, larrysinclair.org and larrysinclairforcongress.com. (Dkt. No. 1 ¶ 18).

On February 10, 2007, then Senator Barack Obama ("Obama") announced that he was running for President of the United States. On January 3, 2008 Obama won the Iowa Democratic caucus. Approximately two weeks later, on January 18, 2008, Sinclair posted a YouTube video

in which he made wild allegations regarding the purchase, sale and use of drugs and sexual activity by and between Sinclair and Obama on November 6 and 7, 1999.  Sinclair hoped and expected to profit and personally benefit from his drug and sex allegations against the Presidential candidate.  (*Id.* ¶¶ 19-22).

In February 2008, after he became aware of Sinclair's allegations and as part of its effort to develop a political website, Parisi contacted Sinclair.  He offered to pay Sinclair $10,000 to take polygraph examinations and to pay him $100,000 if the examinations showed Sinclair was telling the truth.  Whitehouse.com, Inc. later paid Sinclair $20,000 as part of a modified agreement.  (*Id.* ¶ 23).

On February 22, 2008, polygraph examinations of Sinclair were administered by Edward Gelb ("Gelb"), a certified polygraph examiner and past President of the American Polygraph Association and well known examiner, at his office in Los Angeles California.  Sinclair was involved with and agreed to the selection of Gelb.  (*Id.* ¶ 24).

Gelb administered two polygraph examinations, one pertaining to the drug allegation and the other on the sex allegation.  Both examinations were videotaped.  According to Gelb's report, Sinclair indicated deception on both examinations, which was corroborated by two examiners.  Whitehouse.com then provided Sinclair with a copy of the polygraph examination results and posted the results online.  (*Id.* ¶¶ 26-27).

On June 18, 2008, Sinclair held a press conference in the District of Columbia to repeat his drug and sex allegations and alleged that a church choir master, Donald Young, was murdered on December 23, 2007 and suggested that Obama or his campaign was somehow involved in the murder.  However, Sinclair did not mention the Young allegation during his hours long interview with Gelb or during the polygraph examinations.  (*Id.* ¶ 30).

In June 2009, Sinclair self-published through SPI, a copyrighted book entitled *Barack Obama & Larry Sinclair: Cocaine, Sex, Lies & Murder?* (referred to as "the book" or "Sinclair's book"). (*Id.* ¶ 31). A copy of the front and back covers and the book's table of contents is attached. (Oparil Decl. Ex. 2).[1]

Sinclair's book repeated his story about drugs, sexual activity and Donald Young's murder. The book also contains vicious attacks on Parisi and Whitehouse.com. Sinclair's book is replete with false, defamatory and derogatory statements regarding Parisi and the website, including without limitation, the following:

> ▪ In fact, at 12:48 a.m. on February 25, 2008 (the day before Barland's review was even conducted), I received a telephone tip from 207-252-2796 and 207-899-0872, advising me that the polygraph was rigged and was arranged by Dan Parisi and Obama Campaign advisor David Axelrod. The man giving me the tip stated that, "Axelrod and the Obama campaign had agreed to pay Dan Parisi of Whitehouse.com, $750,000 to arrange a rigged polygraph. Parisi and Axelrod were in a heated argument because the Obama camp wanted Parisi to publish that you had failed the polygraph faster than what Parisi had said. Parisi was refusing to publish anything further on the polygraph until he was paid the other half of the three-quarters of a million dollars agreed on."
>
> When I received this information, I contacted Dan Parisi and informed him of what was stated, and I asked Parisi to confirm or deny the allegations. Instead of Parisi denying or confirming the allegations that he refused to respond to the statements and then posted a statement on Whitehouse.com that he had been threatened repeatedly by "Sinclair's supporters and that Whitehouse.com would not publish anything further regarding Larry Sinclair." In addition, Parisi immediately shut down Whitehouse.com, completely scrubbed the site of all posts and comments on the Larry Sinclair/Barack Obama story, and revamped the format of the website requiring individuals to register with Whitehouse.com before being able to comment. It was at that time, Whitehouse.com became the staunchest promoters of Barack Obama, while slamming Hillary Clinton non-stop. I also had asked Parisi to respond; I forwarded the information to Chicago

---

[1]     Plaintiffs would be happy to provide the Court with the book.

Tribune reporter John Crewdson and asked him to look into who the tipster was.  Crewdson actually spoke to the tipster and was told the same thing.  In addition, the tipster stated that I should look very carefully at the FEC campaign finance reports for the period from January 1 through March 31, 2008 for the payments to Parisi.  The tipster also advised me that Parisi had many different holding companies, and the Obama campaign would not have made a single individual payment.

Immediately after confronting Whitehouse.com's Dan Parisi about the allegations that he arranged a rigged polygraph exam, he issued a stop payment of the check issued to me for the polygraph exam.  You see, Parisi had made a deal with David Axelrod and the Obama campaign.  All of this occurred on the very day that I published emails to Mr. Parisi asking for his response to the claims made in an anonymous telephone tip.

▪   The information Edward Gelb had obtained from the extensive pre-polygraph interview suddenly was being posted on the internet at DemocraticUnderground.com, MyBarackObama.com, HuffingtonPost.com, and others.  Only the information had been distorted and edited.  In fact, it was after the rigged "polygraph/fishing expedition" arranged by Dan Parisi in a deal with advisor David Axelrod, that direct attacks began on the internet and by phone against my father's last wife, my nieces and nephews, my mother and my brothers and sisters.

▪   Finally, in February 2008 I was told anonymously that Dan Parisi of Whitehouse.com received $750,000 from the Obama campaign through AKR Media to organize an effort to publicly discredit me.  When I confronted Parisi with this allegation, he did not deny it but instead withdrew the second exonerating polygraph report of Dr. Gordon Barland.  He also failed to post the video of my polygraph as he and Whitehouse.com promised they would do.  He even removed posts from their web site altogether, claiming that they had "had enough of the attacks by Sinclair's supporters and Sinclair himself."

▪   [T]he polygraph exam was announced by the internet pornography fraud Dan Parisi on Whitehouse.com . . . .

(Dkt. No. 1 ¶ 32).

Even the cover of the book is scandalous and defamatory. The front cover of Sinclair's

book shows a picture with crime scene tape and Obama with blood on his hands.  (Oparil Decl.

Ex. 2).  The back cover of the book states that Sinclair was blackballed by book publishers:

> Virtually everyone has heard about Larry Sinclair and his
> allegations regarding a couple of days he spent with Barack Obama
> in Chicago in 1999.  After a highly orchestrated whitewashing by
> the mainstream media of the story, and after being blackballed by
> every single book publisher he contacted regarding the publication
> of his story, Larry Sinclair decided to start his own publishing
> company, and this is the first book from Sinclair Publishing.

(*Id.*).

Rense, who operates a website (rense.com) and has a nationwide radio show, is a well-

known right-wing crackpot who wrote the foreword to Sinclair's book.[2]  The foreword contains

false, defamatory and derogatory statements regarding the plaintiffs, including without

limitation, the following:

> As soon as Larry Sinclair began to make 'noise' on the net and on
> my program, the Obama power base immediately organized a
> clearly high-level, multi-faceted assault on him featuring bizarre
> events like top advisor David Axelrod allegedly hiring internet

---

[2]     Rense's Wikipedia entry states that:

Jeff Rense is an American conspiracy theorist and radio talk-show host of the *Jeff Rense Program*, broadcast on US satellite radio via Republic Broadcasting Network (RBN) and Internet radio.

Rense's radio program and website, Rense.com, cover subjects such as 9/11 conspiracy theories, UFO reporting, paranormal phenomena, Holocaust denial, Zionism, tracking of new diseases and possible resultant pandemics, environmental concerns (see chemtrails), animal rights, possible evidence of advanced ancient technology, geopolitical developments and emergent energy technologies, complementary and alternative medicine among other subjects.

Rense's show has been noted as being among "conspiracy-oriented Internet radio shows that often feature anti-Semites and extremists" by the Anti-Defamation League, a non-profit organization that opposes anti-semitism.

(Oparil Decl. Ex. 20, footnotes omitted).

> porn merchant, Don Parisi, of the otherwise commercial porn site, Whitehouse.com, to set up an embarrassingly rigged polygraph 'examination' of Larry which he graciously made himself available for. The test, as you will read, was administered by the strange and rather shady Edward I. Gelb, polygraph examiner for hire, who among other things represented himself as having a Ph.D. when he apparently does not.

(Dkt. No. 1 ¶ 33).

Sinclair's preposterous allegations have been the subject of significant media attention (*e.g.*, Oparil Decl. Exs. 3-8, 17, 19, 21).

In addition, various "product descriptions" of Sinclair's book by Amazon, BAM and Amazon also make false and defamatory statements regarding plaintiffs. (*Id.* ¶¶ 35-36, 38-39). BAM promoted the Sinclair book by writing that: "You'll read how the Obama campaign used internet porn king Dan Parisi and Ph.D. fraud Edward I. Gelb to conduct a rigged polygraph exam in an attempt to make the Sinclair story go away." (Oparil Decl. Exs. 9-10). BAM also posted customer reviews of Sinclair's book, which provided BAM with knowledge of the defamatory and scandalous nature of Sinclair's book. (Oparil Decl. Exs. 11-12).

The above described Sinclair's book and promotional statements (referred to as "the defamatory statements") referred to Parisi and Whitehouse.com by name, were made of and concerning him and Whitehouse.com, and were so understood by those reading the defamatory statements.[3] (Dkt. No. 1 ¶ 41). The following defamatory statements form the basis for the claims alleged herein:

   a.   Plaintiffs have never discussed Sinclair or his allegations with David Axelrod or the Obama campaign, or anyone acting on their behalf.

---

[3]   Since publication of the defamatory statements, SPI and Sinclair have made other untrue statements of fact about the plaintiffs orally or in writing, including in postings on the internet. (*See, e.g.*, Dkt. No. 1 ¶ 43).

b.      Plaintiffs have never conspired, criminally or otherwise, with Obama, the Obama campaign or Axelrod or anyone acting on their behalf.

c.      Plaintiffs have never entered into an agreement, contract, or understanding with David Axelrod, the Obama campaign, or anyone acting on their behalf.

d.      Plaintiffs never agreed to accept or be paid money or other benefit by David Axelrod, the Obama campaign, or anyone acting on their behalf, for any purpose.

e.      Plaintiffs have never "made a deal with David Axelrod and the Obama campaign" for any purpose, including without limitation, to arrange a rigged polygraph examination of Sinclair.

f.      Plaintiffs did not "rig" Sinclair's polygraph examinations.

g.      Plaintiffs have never helped anyone to get away with murder.

h.      Parisi is not and has never been a pornographer.  He has not produced, created or made any pornographic material.

i.      During the relevant time period, Whitehouse.com did not contain pornographic material.

(*Id.* ¶ 44).  The defamatory statements were made and published by defendants with knowledge of their falsity or with reckless disregard for their truth.  The defamatory statements were made without any evidence, direct or circumstantial, that they were true when made.  Sinclair's book and the statements published by other defendants did not contain a scintilla of factual support for their wildly false and reckless untrue statements.  (*Id.* ¶ 45).  Prior to the filing of this action, defendants knew or had reason to know of the defamatory statements.  (*Id.* ¶ 47).

As a result of the defamatory statements of the defendants, the Whitehouse.com website was shut down in 2008.  Whitehouse.com had hoped to sell the site to political/news entities,

particularly during the historic 2008 presidential election year, but was unable to do so in light of the taint of Sinclair's defamation.  Plaintiffs have actual and special damages in the amount of at least $30,000,000.  (*Id.* ¶ 48).

SPI, Sinclair, B&N, Amazon, and BAM have offered for sale and sold Sinclair's book throughout the United States, including in the District of Columbia, in stores and/or through internet order and delivery.  (*Id.* ¶ 34).  BAM takes possession of the books and then ships them to customers using their own contact information and packaging.[4]  Plaintiffs' counsel ordered Sinclair's book from BAM and BAM shipped it to him in Washington, DC.  (Oparil Decl. Ex. 16).

On May 18, 2010, plaintiff's counsel sent a letter to BAM's Chairman, President and CEO  with a draft complaint alleging defamation and related claims against Amazon relating to the book by Lawrence Sinclair.  (Oparil Decl. Ex. 14).  Plaintiffs filed the complaint here on May 28.  Plaintiffs served BAM on June 4.  (Dkt. No. 5).  BAM continued to sell the book until approximately June 15.

The complaint alleges four claims on which plaintiffs seek recovery from the defendants: defamation (libel *per se*/libel) (¶¶ 54-64), false light invasion/misappropriation of privacy (¶¶ 65-69), business disparagement (¶¶ 70-76), and tortious interference with economic advantage (¶¶ 77-82).

## ARGUMENT

There are two underlying bases for plaintiffs' defamation based claims against BAM:  (1) its sales of Sinclair's book; and (2) the product description it used in marketing and selling that book.  Each will be addressed in turn.  In deciding the motion to dismiss, the Court must accept

---

[4]      BAM not only takes orders at its internet site, but it also takes telephone orders.  (Oparil Decl. ¶ 20).  Further, BAM's Washington, DC store will order books for pick up.  (*Id.*).

as true all of the factual allegations in the complaint.  *See, e.g., Erickson v. Pardus*, 551 U.S. 89,

93-94 (2007).  "In appraising the sufficiency of the complaint we follow, of course, the accepted

rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond

doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him

to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

## I.    PLAINTIFFS HAVE STATED A CLAIM FOR DEFAMATION AND RELATED TORTS AGAINST BAM BASED ON SINCLAIR'S BOOK.

BAM claims that it is only a distributor, *i.e.*, bookseller, of the book authored by Sinclair

and published by SPI that is the subject of this dispute.  There can be no doubt that BAM

promoted, offered for sale and sold Sinclair's book.  (Dkt. No. 1 ¶¶ 34, 38).  BAM's argument

(Dkt. No. 34 at 6-8) that plaintiffs did not state a claim against the bookseller is without merit.

The distributor of a book, including a bookseller, may be liable for defamation and

related torts.  Once a distributor has knowledge of the tortious nature of the material within its

possession or control, it must stop making the material available to others or face liability.  This

knowledge can be actual, as in the case of material that is defamatory on its face, or inferred, as

may be the case when a particular author or publisher has published notoriously sensational or

scandalous material.

"[O]ne who only delivers or transmits defamatory matter published by a third person is

subject to liability if, but only if, he **knows or has reason to know** of its defamatory character."

RESTATEMENT (SECOND) OF TORTS § 581 (emphasis added).  "It would appear quite clearly that

those who perform a secondary role in disseminating defamatory matter authored and published

by others in the form of books, magazines, and the like -- as in the case of libraries, news

vendors, distributors, and carriers -- would not be subject to liability to anyone in the absence of

proof that they knew or had reason to know of the existence of defamatory matter contained in

matter published." *Dworkin v. Hustler Magazine, Inc.*, 611 F. Supp. 781, 786 (D. Wyo. 1985)

(quoting PROSSER AND KEETON ON THE LAW OF TORTS § 113 at 810 (5th ed. 1984)).  *See also*

*Hartman v. Am. News Co.*, 171 F.2d 581 (7th Cir. 1948) ("the applicable law clearly is that the

distributor of an alleged libel is not liable if he can prove to the satisfaction of the jury that he did

not know of the libel, and that he was not negligent in not knowing."); *Lerman v. Chuckleberry

Pub., Inc.*, 521 F. Supp. 228, 235 (S.D.N.Y. 1981) ("vendors and distributors of defamatory

publications are not liable if they neither know nor have reason to know of the defamation",

citing RESTATEMENT § 581); *Lewis v. Time Inc.*, 83 F.R.D. 455, 464 (E.D. Cal. 1979) (plaintiff

seeking to impose liability on a distributor for a libel which appeared in a magazine must prove

that the distributor either knew of the libelous content of the article or that facts were known

which imposed a duty to investigate), *aff'd*, 710 F.2d 549 (9th Cir. 1983); *Osmond v. EWAP,

Inc.*, 153 Cal. App. 3d 842, 854, 200 Cal. Rptr. 674 (1984) ("the rule formulated in section 581

of the Restatement Second of Torts governs this action against EWAP for libel. Accordingly, in

order to find the malice or scienter necessary to hold EWAP liable for disseminating the libelous

material, a jury would be required to find that EWAP knew or had reason to know of its

defamatory character."); *Janklow v. Viking Press*, 378 N.W.2d 875, 881 (S.D. 1985) (bookseller

may be held liable for defamation as set forth in Restatement § 581); *Church of Scientology. v.

Minnesota State Med. Ass'n*, 264 N.W.2d 152, 156 (Minn. 1978) ("Those who merely deliver or

transmit defamatory material previously published by another will be considered to have

published the material only if they knew, or had reason to know, that that the material was false

and defamatory", citing RESTATEMENT § 581).

   In *Lerman*, 521 F. Supp. 228, the Court denied the defendant-distributors' motion for

summary judgment, finding that there were factual issues as to the nature and extent of the

distributors knowledge and role in the distribution of a magazine claimed to be defamatory.  "In addition, I find that questions of fact clearly are presented with respect to whether special circumstances existed requiring PDC to review the content of the issues of Adelina published after the May 1980 issue."  *Id*. at 237.

A bookseller's knowledge can be shown by circumstantial evidence.  *Smith v. California*, 361 U.S. 147, 154 (1959) ("Eyewitness testimony of a bookseller's perusal of a book hardly need be a necessary element in proving his awareness of its contents.  The circumstances may warrant the inference that he was aware of what a book contained, despite his denial.").

Here, plaintiffs allege that prior to the filing of this action, defendant BAM knew or had reason to know of the defamatory statements at issue but continued to publish, offer for sale and/or sell Sinclair's book.  (Dkt. No. 1 ¶¶ 47, 49; *see also id*. ¶ 58 ("The defamatory statements were made and published by defendants with knowledge of their falsity or with reckless disregard for their truth."); *id*. ¶ 67 ("Defendants had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which Parisi would be placed."); *id*. ¶ 72 ("At the time they made the defamatory statements, defendants, and each of them, had actual knowledge of the falsity of their statements and had actual serious doubts as to the truth of their statements, yet made the statements with knowledge of their falsity and in reckless disregard of their truth or falsity.").  Thus, plaintiffs have stated a claim that a bookseller such as BAM is liable for defamation.

Also, the allegations in the complaint are supported by BAM's own website, which included a customer review calling Sinclair's book a "libelous screed":



(Oparil Decl. Exs. 11-12).   Further, Sinclair's preposterous allegations regarding then-Senator

Obama and Parisi were the subject of wide public discussion both before and after BAM began

selling the defamatory book.   (*E.g., id*. Exs. 3-8, 17, 19, 21).   Plaintiffs fully expect that

discovery from BAM will support its allegations that BAM knew or had reason to know of the

defamatory character of Sinclair's book.   *Curran v. Amazon.com, Inc*., 2008 U.S. Dist. LEXIS

12479, *42-43 (S.D. W. Va. Feb. 19, 2008) ("Plaintiff is entitled to the opportunity to prove his

allegations of a joint venture. At this time, Amazon's argument does not provide the court with a

basis to dismiss it from the litigation.").

In addition, if a particular author or publisher has published "notoriously sensational or

scandalous books," a bookstore offering such literature takes the risk of being held liable for

defamation:

> Bookshops and circulating or lending libraries come within the
> rule stated in this Section.   The vendor or lender is not liable, if
> there are no facts or circumstances known to him which would
> suggest to him, as a reasonable man, that a particular book contains
> matter which upon inspection, he would recognize as defamatory.
> Thus, when the books of a reputable author or the publications of a
> reputable publishing house are offered for sale, rent or free
> circulation, he is not required to examine them to discover whether
> they contain anything of a defamatory character.   If, however, a
> particular author or a particular publisher has frequently published
> **notoriously sensational or scandalous books**, a shop or library
> that offers to the public such literature may take the risk of
> becoming liable to any one who may be defamed by them.

RESTATEMENT (SECOND) OF TORTS § 581 cmt. e (emphasis added).  "In context, those words describe authors or publishers who notoriously use defamatory material in their publications. Accordingly, the word 'reputable' in Comment (e) refers to the publisher's reputation for truth and veracity." *Osmond*, 153 Cal. App. 3d at 856; *see also Church of Scientology*, 264 N.W.2d at 156 ("The article's original publisher was known to be reputable, therefore MSMA and its officers had no reason to believe that the article was false and defamatory.").

To be sure, BAM did not offer for sale a book of a "reputable" author or publishing house.  Sinclair's book is the very definition of "notoriously sensational or scandalous", with his allegations gracing the cover of multiple editions of the *Globe* tabloid.  (Oparil Decl. Exs. 4-8). Sinclair has a much publicized extensive criminal record, including for fraud.  (*See, e.g.*, Oparil Decl. Ex. 1).  He self published the book through defendant SPI because no reputable publisher would do so.  His initial "print on demand" ("POD") company refused to print the book because of is "nature."  (Oparil Decl. Ex. 18).   Discovery will also show that Sinclair attempted to obtain a reputable publisher but was unable to do so.  Moreover, the author of the foreword to Sinclair's book, defendant Rense, is no more reputable.  He is a right wing conspiracy theorist with a radio program that features such things as UFOs, Holocaust denial, and anti-semitism.  (*See supra* n.2).  The fact that Rense was the author of the foreword to the book also should have raised a red flag with BAM.[5]

---

[5]     This case is certainly on par with *Brandewyne v. Author Solutions, Inc.*, Mem. Decision, Case No. 04-CV-4363 (18th Judicial Dist. Ct., Kansas Aug. 3, 2006) (Oparil Decl. Ex. 15). There, Brock wrote a book about his ex-wife, Brandewyne, which  alleged that Brandewyne was a child abuser, drug abuser, plagiarizer and felon, who had adulterous affairs and hired a hit man to kill Brock.  Brandewyne sued Brock and his self publishing company that printed the book, AuthorHouse.  A jury found Authorhouse liable and returned a verdict for $230,000.  The Kansas Court subsequently ruled that Authorhouse must pay $240,000 in punitive damages.  The Court found that AuthorHouse was responsible for the damages because the company knew that Brock did not want to spend money on printing the book only to have it canceled because of its

Given the "notoriously sensational or scandalous" book authored by Sinclair, published by SPI, and distributed by BAM, BAM assumed the risk of becoming liable to any one who may be defamed by them, including the plaintiffs here.

Accordingly, plaintiffs have stated a claim for defamation and related torts based on its promoting, offering for sale, and sale of *Barack Obama & Larry Sinclair: Cocaine, Sex, Lies & Murder?* BAM's motion to dismiss should be denied.

## II.   LIABILITY BASED ON BAM'S RESPONSIBILITY FOR THE DEFAMATORY PRODUCT DESCRIPTION IT USED TO PROMOTE AND SELL SINCLAIR'S BOOK IS NOT BARRED BY THE COMMUNICATIONS DECENCY ACT.

### A.   As An Initial Matter, BAM's Affirmative Defense Should Not Be Resolved On A Rule 12(b)(6) Motion To Dismiss For Failure To State A Claim.

BAM argues that the claims pertaining to the defamatory "product description" should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) based on the affirmative defense of immunity created by the Communications Decency Act ("CDA"), 47 U.S.C. § 230.   (Dkt. No. 34). However, a Rule 12(b)(6) motion to dismiss for failure to state a claim should not be decided based on an alleged affirmative defense.  *See*, *e.g.*,  *Gomez v. Toledo*, 446 U.S. 635, 640 (1980) ("Since qualified immunity is a defense, the burden of pleading it rests with the defendant.  It is for the official to claim that his conduct was justified by an objectively reasonable belief that it was lawful.  We see no basis for imposing on the plaintiff an obligation to anticipate such a defense by stating in his complaint that the defendant acted in bad faith.") (citations omitted);

content and concerns with libel issues, as other publishers had done. Mem. Decision at 4. AuthorHouse argued it merely printed the book after Brock signed a contract taking full responsibility for the contents. In addition, the company said, only three copies of the book were sold. "While an online publisher cannot be expected to read every book from every customer, given Brock's description of his own book, a responsible publisher would make some effort to screen the content of the book at issue in this case before accepting the book for publication." *Id.* at 10.

*Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) ("It follows, therefore, that a motion to dismiss filed under Federal Rule of Procedure 12(b)(6), which tests the sufficiency of the complaint, generally cannot reach the merits of an affirmative defense, such as the defense that the plaintiff's claim is time-barred.  But in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6).  This principle only applies, however, if all facts necessary to the affirmative defense 'clearly appear[] on the face of the complaint.'") (citations omitted).

Here, BAM's motion invokes an affirmative defense of immunity under the CDA.  "As an initial matter, the Court notes that invocation of Section 230(c) immunity constitutes an affirmative defense.  As the parties are not required to plead around affirmative defenses, such an affirmative defense is generally not fodder for a Rule 12(b)(6) motion.  Instead, such a defense is generally addressed as Rule 12(c) or Rule 56 motion." *Novak v. Overture Services, Inc.*, 309 F. Supp. 2d 446, 452 (E.D.N.Y. 2004), citing *Doe v. GTE Corp.*, 347 F.3d 655, 657 (7th Cir. 2003) ("Affirmative defenses do not justify dismissal under Rule 12(b)(6);  litigants need not try to plead around defenses.").  *See also Doctor's Assocs. v. QIP Holders, LLC*, 2007 U.S. Dist. LEXIS 28811, *6-7 (D. Conn. Apr. 18, 2007) (CDA immunity issue could not be decided on a motion to dismiss); *Sabbato v. Hardy*, 2000 Ohio App. LEXIS 6154 (Ohio Ct. App. Dec. 18, 2000) ("from our examination of the four corners of the pleadings, in particular, where it is alleged that appellee participated in the libelous remarks, we find the automatic cloak of immunity under Section 230 was not available without first converting the motion to dismiss into a motion for summary judgment in order to examine facts outside the pleadings.").

Plaintiffs therefore object to deciding BAM's CDA defense on a Rule 12(b)(6) motion to dismiss.  It is noteworthy that the other two bookseller defendants, Barnes & Noble and Amazon, filed answers to the complaint and not motions to dismiss.  Indeed, Barnes & Noble and Amazon filed their answers after BAM filed its dismissal motion.  (Dkt. Nos. 34, 36, 42).[6]  Further, as discussed below, the complaint alleges that BAM made false and defamatory statements in the product description.  (Dkt. No. 1 ¶¶ 38, 58).  It would be improper to grant the motion to dismiss.  *See Doctor's Assocs.*, 2007 U.S. Dist. LEXIS 28811, *6-7 ("this court finds it cannot decide whether Quiznos is entitled to immunity at this stage of the proceeding. . . .  [T]aking the allegations in the Fourth Amended Complaint as true for purposes of this motion, the court cannot, as a matter of law, state that 'the plaintiff can prove no set of facts in support of' a finding of no immunity under the CDA. Instead, whether or not Quiznos is an 'information content provider' is a question awaiting further discovery."), quoting *Conley*, 355 U.S. at 45-46; *Hill v. StubHub, Inc.*, 07-CVS-11310, Order and Op. on Mot. to Dismiss at 8 (N.C. Super. Ct. Guilford County July 14, 2008) (Oparil Decl. Ex. 16) (denying motion to dismiss since discovery will determine "whether the immunity provided by the CDA is applicable to all of StubHub's conduct.").

In this case, a Rule 12(b)(6) motion should not be used to decide whether BAM has a CDA affirmative defense.  Plaintiff's complaint does not allege that a third party was not the sole author of the product description.  As discussed below, BAM should be deemed an "information content provider" and thus has no CDA affirmative defense.  The precise role that BAM or

---

[6]     Sinclair filed an answer *pro se* on July 15, 2010, which consisted of a general denial of the allegations of the complaint.  (Dkt. No. 28-1).   The answer was also improperly filed on behalf of corporate defendant SPI.  Plaintiffs' motion for a default judgment against SPI is pending.  (Dkt. No. 24).  On July 30, the Court granted plaintiffs' motion for substituted service on defendant Rense.  The summons and complaint have been posted at Rense's property and sent to him by mail.  The appropriate legal notice is being published in Rense's local newspaper.

others had in the creation of that description is a matter that will require discovery.  All facts necessary to the affirmative defense do not clearly appear on the face of the complaint.  Accordingly, the Court should deny BAM's motion.

**B.     Plaintiffs Allege That BAM Is Responsible For The Defamatory Product Description.**

In the event that the Court does consider the merits of BAM's motion with respect to the product description, the motion should be denied.  BAM argues that all claims pertaining to the "product description" used by BAM to market and promote Sinclair's book are barred by the CDA.  The CDA provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  *Id*. § 230(c)(1).  The CDA further provides that:

> No provider or user of an interactive computer service shall be held liable on account of—
> (A) any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or
> (B) any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).

*Id*. § 230(c)(2).  The phrase "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access to the Internet and such systems operated or services offered by libraries or educational institutions." *Id*. § 230(f)(2).  The phrase "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service."  *Id*. § 230(f)(3).  Congress limited the scope of the immunity provided to the provider of interactive computer services:

(1)     No effect on criminal law.   Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of title 18, or any other Federal criminal statute.

(2)     No effect on intellectual property law.  Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

(3)     State law.  Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

*Id.* § 230(e)(1)-(3).

Plaintiffs allege that BAM's product description (or synopsis) made false and defamatory statements regarding plaintiffs.  (Dkt. No. 1 ¶ 38).  They also allege that the "defamatory statements were **made** and published by defendants with knowledge of their falsity or with reckless disregard for their truth."  (*Id.* ¶ 58).  BAM's motion did not come forward with any affidavits or other competent evidence that BAM did not make or was not responsible for the creation and development of the product description that it used to sell Sinclair's book.

In *Whitney Information Network, Inc. v. Xcentric Ventures, LLC*, 2006 U.S. App. LEXIS 19518 (11th Cir. Aug. 1, 2006), the plaintiff alleged that the defendant rewrote parts of consumer complaints submitted by third parties and made other defamatory statements that were posted on its website.  In moving to dismiss, the defendants relied on a declaration that they did not "author[] the statements that are the subject of this lawsuit."  *Id.* at *7.  The Court found that the declaration was conclusory and thus insufficient to support a finding on a motion to dismiss that CDA immunity applied.   *Id.* at *14-15.  Here, BAM did not bother to submit **any** evidence that it played no part and had no responsibility for the creation and development of the product

description. Submission of such purported evidence with a reply brief is too late.[7]  Even had

BAM done so, plaintiffs would be entitled to discovery related to the creation and development

of the product description.  *See* Fed. R. Civ. P. 56(f); *Doctor's Assocs.*, 2007 U.S. Dist. LEXIS

28811, *6-7.  Consequently, the Court should deny BAM's motion to dismiss.

BAM's argument rests entirely on an allegation in another case, *Parisi, et al. v. Ingram*

*Content Group, Inc., et al.*, Civil Action No. 10-974-RJL.  That complaint, which has not yet

been served, alleges that Ingram and its affiliate Lightning Source Inc. "wrote, distributed and/or

published" promotional statements for Sinclair's book.  (Dkt. No.  34 Ex. A ¶ 35).  The same

complaint also alleges that "BAM makes false and defamatory statements" in its product

description.  (*Id*. ¶ 32).  The *Ingram* complaint does not allege that those defendants were solely

responsible for the product description.  The allegation in paragraph 35 was clearly written in the

disjunctive.  *See, e.g.*, *Philips Electronics N. Am. Corp. v. Hope*, 631 F. Supp. 2d 705, 724 n.7

(M.D.N.C. 2009) ("based on the use of the disjunctive 'and/or' in this provision, these activities

appear to be distinctly separable"); *United States v. Ramsey*, 503 F. Supp. 2d 554, 560 (N.D.N.Y.

2007) ("and/or' is a disjunctive connective).  The CDA defines an "information content

provider" as "any person or entity that is responsible, in whole **or in part**, for the creation or

development of information provided through the Internet or any other interactive computer

service." 47 U.S.C. § 230(f)(3) (emphasis added).  Because the *Ingram* complaint does not allege

that Ingram and Lightning were **solely** responsible for the product description, the Court should

not find that CDA immunity applies here.

---

[7]     *See, e.g.*, *Uhar & Co., Inc. v. Jacob*, 2010 WL 1745134, *6 (D.D.C. 2010) ("Because these arguments were raised for the first time in the defendant's reply brief, the court will not consider them in resolving this motion.").

### C.     BAM Adopted The Product Description As Its Own.

The CDA does not grant "immunity to those who actively encourage, solicit and profit from the tortious and unlawful communication of others."  *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 489 F.3d 921, 928 (9th Cir. 2007).   Assuming *arguendo* that a third party wrote the product description, BAM adopted it as its own to advertise and promote the sale of Sinclair's book by BAM.   The product description used by BAM does not suggest that it was authored by Sinclair, SPI or anyone else.  (Oparil Decl. Exs. 9-10).  Any reasonable person would read the product description as being one created by or for BAM.  *See, e.g.*, *Donato v. Moldow*, 374 N.J. Super. 475, 490 (App. Div. 2005) ("[W]ith respect to any messages posted by Moldow, using his own name or the appellation 'Webmaster,' he was a content provider.").   Content providers are not immune under the CDA, which only immunizes "information provided by *another* content provider."   47 U.S.C. § 230(c)(1) (emphasis added); *Anthony v. Yahoo, Inc.*, 421 F. Supp. 2d 1257, 1263 (N.D. Cal. 2006).   As such, BAM has adopted the description and can be held liable for its contents.   BAM has not cited any decision to the contrary.

The defamatory product description is not a third party comment, but a description used to sell Sinclair's book.   Plaintiffs are by no means seeking to hold BAM liable for third-party comments or reviews of the book posted on BAM's website.   The defamatory/libelous statements at issue were not posted by third parties. The description was used by BAM to sell the book.   BAM is trying to stretch the CDA to encompass its own conduct and absolve itself of any liability.

In *Hy Cite Corp. v. badbusinessbureau.com, L.L.C.*, 418 F. Supp. 2d 1142 (D. Ariz. 2005), plaintiffs alleged that defendants "solicit individuals to submit reports with the promise that individuals may ultimately be compensated for their reports."  *Id.* at 1149.   According to the

Court, "[t]hese allegations arguably could support a finding that Defendants are 'responsible . . . for the creation or development of information' provided by individuals submitting Rip-off Reports in response to Defendants' solicitation." *Id.*, citing 47 U.S.C. § 230(f)(3). Taking plaintiff's allegations as true, the *Hy Cite Corp.* Court went on to find that defendants were not entitled to immunity under the CDA at the motion to dismiss stage of the case. *Id.*

In *FTC v. Accusearch, Inc.*, 2007 U.S. Dist. LEXIS 74905 (D. Wyo. Sept. 28, 2007), the Court found that by affirmatively soliciting request for phone records and purchasing them for resale, the defendants participated in the creation or development of the information, and thus did not qualify for § 230 immunity. *Id.* at *16.

BAM did not cite cases on point. A case on point would be on in which a bookseller was held not to have libeled/defamed a person by their own description of a book, *e.g.*, in a catalog description.

Here, BAM used materials to market and sell books for its own financial gain. The CDA does not provide immunity to a retailer selling goods for its own account. In this situation, the CDA does not provide BAM with immunity.

**D.    The CDA Does Not Bar Parisi's Right Of Publicity Claim.**

The CDA immunizes an interactive service provider from a state law right of publicity claim. Section 230(e), entitled "Effect on other laws," provides, in relevant part, that:

> No effect on intellectual property law. Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

> State law. Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

47 U.S.C. § 230(e)(2), (3). Under this plain language, the CDA does not bar any claim pertaining

to intellectual property. *See, e.g.*, *Universal Comm'n Sys., Inc. v. Lycos, Inc.*, 478 F.3d 413, 422-

23 (1st Cir. 2007) (claims based on intellectual property laws are not subject to § 230 immunity);

*Atlantic Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 704 (S.D.N.Y. 2009) ("I

conclude, as a matter of law, that Section 230(c)(1) does not provide immunity for either federal

or state intellectual property claims."); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288,

299 (D.N.H. 2008) ("§ 230(e)(2) excepts state as well as federal intellectual property laws from

the scope of the Act's immunity provision."); *Gucci Am., Inc. v. Hall & Assocs.*, 135 F. Supp. 2d

409, 415 (S.D.N.Y. 2001) (accord).[8]

The right of publicity is a widely recognized intellectual property right. *See, e.g.*,

*Zacchini v. Scripps-Howard Broad. Co.*, 433 U.S. 562, 573 (1977) (state's interest in providing

a right of publicity is "closely analogous to the goals of patent and copyright law"); *ETW Corp.*

*v. Jireh Publ'g, Inc.*, 332 F.3d 915, 928 (6th Cir. 2003) ("The right of publicity is an intellectual

property right of recent origin which has been defined as the inherent right of every human being

to control the commercial use of his or identity"); *Allison v. Vintage Sports Plaques*, 136 F.3d

---

[8]      One court has ruled that the term "intellectual property" in the CDA is limited to "federal intellectual property. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1119 (9th Cir. 2007). The *Atlantic Recording* decision, however, explained why the 2007 decision was erroneous: "In four different points in Section 230(e), Congress specified whether it intended a subsection to apply to local, state, or federal law. See 47 U.S.C. §§ 230(e)(1) ('any other *Federal* criminal statute'), (3) ('any *State* law' and 'any *State or local* law'), (4) ('any similar *State* law') (emphasis added in all). It is therefore clear from the statute that if Congress wanted the phrase 'any law pertaining to intellectual property' to actually mean 'any federal law pertaining to intellectual property,' it knew how to make that clear, but chose not to." 603 F. Supp. 2d at 703. *See also Doe*, 540 F. Supp. 2d at 299-300 ("The Ninth Circuit made no attempt to reckon with the presence of the term 'any' -- or for that matter, the absence of term 'federal' -- in § 230(e)(2) when limiting it to federal intellectual property laws. Nor did the Ninth Circuit make any effort to reconcile its reading of § 230(e)(2) with other limiting provisions of § 230 which specifically identify federal or state law as such. . . . The content of these provisions indicates that, where Congress wished to distinguish between state and federal law in § 230, it knew how to do so.").

1443, 1448 (11th Cir. 1998) (the common law right of publicity is an intellectual property right for purposes of the first-sale doctrine); *Doe*, 540 F. Supp. 2d at 302 (the right of publicity is a widely recognized intellectual property right and § 230 immunity does not apply to claim for infringement of right to publicity); *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 399, 106 Cal. Rptr. 2d 126, 135 (2001) ("The right of publicity, like copyright, protects a form of intellectual property that society deems to have some social utility."); 4 J. McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 28.1 (4th ed. 2003) ("The right of publicity is property, and is properly categorized as a form of intellectual property."); BLACK'S LAW DICTIONARY 813 (7th ed. 1999) (defining intellectual property as "A category of intangible rights protecting commercially valuable products of the human intellect. The category comprises primarily trademark, copyright, and patent rights, but also includes trade-secret rights, publicity rights, moral rights, and rights against unfair competition."). **"**One who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy." RESTATEMENT (SECOND) OF TORTS § 652C. "The interest protected by the rule ... is the interest of the individual in the exclusive use of his own identity, in so far as it is represented by his name or likeness, and in so far as the use may be of benefit to him or to others." *Id.* § 652C, cmt. a.

In *Villalovos v. Sundance Assocs., Inc.*, 2003 U.S. Dist. LEXIS 387 (N.D. Ill. Jan. 13, 2003), the Court denied a motion to dismiss a right of publicity claim arising out of the unauthorized use of a non-celebrity plaintiff's first name and address in a personal advertisement seeking sexual partners, despite defendant's argument that use did not injure value of plaintiff's identity. *See also Doe*, 540 F. Supp. 2d at 304.

Here, Parisi alleges that the defendants have misappropriated right to publicity by using his name and alleged description to promote and sell Sinclair's book.  (Dkt. No. 1 ¶¶ 38, 41, 66-69).  Apart from its argument that defendant's claims do not constitute "actionable defamation" (Dkt. No. 34 at 8), BAM does not assert that Parisi's misappropriation claim is improperly pled or that there is any other basis to dismiss it under Rule 12(b)(6).  Thus, BAM's motion to dismiss Count II of the complaint should be denied.

## III.    ALTERNATIVELY, PLAINTIFFS SHOULD BE GRANTED LEAVE TO FILE AN AMENDED COMPLAINT.

Assuming *arguendo* that the Court were to find that some or all of the claims are subject to dismissal, plaintiffs respectfully request leave to file a amended complaint.  Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend a complaint "shall be freely given when justice so requires." The liberal amendment policy embodied in Rule 15(a) is "a mandate to be heeded," and leave should be granted unless the opposing party can demonstrate "extraordinary circumstances," such as excessive delay in the resolution of the case, bad faith on the part of the movant or undue prejudice to the non-movant.  *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Fuller v. Vines*, 36 F.3d 65, 67 (9th Cir. 1994) (Ninth Circuit follows a "strong policy permitting amendment"); *Johnson v. Buckley*, 356 F.3d 1067 (9th Cir. 2004) ( "Five factors are taken into account to assess the propriety of a motion for leave to amend:  bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint."); *Johnson v. Oroweat Foods Co.*, 785 F.2d 503, 509 (4th Cir. 1986); *Hill v. Brush Engineered Materials, Inc.*, 383 F. Supp. 2d 814, 824 (D. Md. 2005).  "The law is well settled 'that leave to amend a pleading should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" *Edwards v. City of Goldsboro*, 178 F.3d 231,

242 (4th Cir. 1999), quoting *Johnson*, 785 F.2d at 509.   Absent proof of such factors, it is an abuse of discretion to deny leave to amend.   *See, e.g.*, *Hill*, 383 F. Supp. 2d at 824; *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000); *Agere Sys. Guardian Corp. v. Proxim, Inc.*, 190 F. Supp. 2d 726, 732 (D. Del. 2002).   Where possible, disputes should be resolved "comprehensively and on the merits." *Agere Sys.*, 190 F. Supp. 2d at 732.

There would be no prejudice to the defendants from granting the motion to amend.   The case is in its earliest stage, with motions to dismiss pending.

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that BAM's motion to dismiss be denied.

Dated:  August 25, 2010                                  Respectfully submitted,

<div style="margin-left: 50%;">

/s/ Richard J. Oparil
Richard J. Oparil (D.C. Bar No. 409723)
PATTON BOGGS LLP
2550 M Street, NW
Washington, DC 20037
(202) 457-6000
(202) 457-6315 (fax)

Kevin M. Bell
PATTON BOGGS LLP
8484 Westpark Drive
McLean, VA 22102
(703) 744-8000
(703) 744-8001 (fax)

Attorneys for Plaintiffs

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 25, 2010, a copy of the foregoing was served on counsel

for the parties that have appeared in the case by the Court's ECF system and on the following by

first class mail, postage prepaid:

> Lawrence W. Sinclair
> P.O. Box 1963
> Washington, DC 20013
>
> Sinclair Publishing, Inc.
> P.O. Box 1963
> Washington, DC 20013
>
> Jeffrey Rense
> 4896 Highway 66
> Ashland, OR 97520-9712

> s/ Richard J. Oparil
> Richard J. Oparil (DC Bar No. 409723)

5114817