# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DANIEL PARISI, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Case No. 10-897 (RJL) |
| | ) |
| LAWRENCE W. SINCLAIR A/K/A | ) |
| "LARRY SINCLAIR", *et al.*, | ) |
| | ) |
| Defendants. | ) |

ﺟﻞ

## MEMORANDUM OPINION
(March **3 1**   , 2011) [#34, 53, 60]

Plaintiffs Daniel Parisi, Whitehouse.com, Inc., Whitehouse Network LLC, and

White House Communications Inc. (collectively, "plaintiffs") have brought this diversity

action against seven defendants, including the booksellers Books-A-Million, Inc.

("BAM"), Barnes & Noble, Inc. and barnesandnoble.com llc (collectively, "B&N"), and

Amazon.com, Inc. ("Amazon") (collectively, "the bookseller defendants"), for torts

stemming from the internet listing and sales of a book written by Larry Sinclair entitled

*Barack Obama & Larry Sinclair: Cocaine, Sex, Lies & Murder?*  In total, plaintiffs seek

to recover for five counts: libel per se/libel; false light invasion/misappropriation of

privacy; business disparagement; tortious interference with economic advantage; and

civil conspiracy.  Now before the Court are BAM's Motion to Dismiss, EFC No. 34,

B&N's Motion for Summary Judgment, ECF No. 60, and Amazon's Motion for

Summary Judgment, ECF No. 53.  After careful consideration of the relevant law, the

pleadings and oral arguments of counsel, and the entire record, the motions are GRANTED.

## BACKGROUND

In January 2008, Larry Sinclair, also a defendant in this case, made public certain allegations regarding the use of drugs with and sexual activity between himself and then-presidential candidate Senator Barack Obama. Compl. ¶ 21. Parisi, the owner and operator of the website Whitehouse.com, challenged Sinclair to take a polygraph regarding his allegations. *Id.* ¶ 23. Sinclair ultimately accepted this challenge and polygraph examinations were administered by Edward Gelb in February 2008. *Id.* ¶ 24. In June 2009, Sinclair wrote and published a book about his allegations and subsequent interactions with Parisi and Gelb entitled *Barack Obama & Larry Sinclair: Cocaine, Sex, Lies & Murder?* ("the Sinclair book"). *Id.* ¶ 31. Jeffrey Rense, also a defendant in this case, wrote the forward to the book. *Id.* ¶ 33. Plaintiffs contend that the Sinclair book, as well as the forward, contain defamatory statements regarding Parisi and the website, and further, that these statements caused the website Whitehouse.com to shut down in 2008. *Id.* ¶¶ 32, 44, 48. Indeed, Parisi had hoped to sell that site to a mainstream political/news entity during the 2008 presidential election year, but now alleges that he was unable to do so in light of Sinclair's defamation. *Id.* Thus, he and his fellow plaintiffs claim damages of $30,000,000. *Id.*

The defendant booksellers, BAM, B&N, and Amazon, each offered Sinclair's self-published book for sale. *Id.* ¶ 34. Each bookseller's website description of the book also included the following promotional sentence: "You'll read how the Obama campaign

2

used internet porn king Dan Parisi and Ph.D. fraud Edward I. Gelb to conduct a rigged

polygraph exam in an attempt to make the Sinclair story go away." *Id.* ¶¶ 35 (Amazon),

38 (BAM), 39 (B&N); Pls.' Opp'n to Amazon Mot., ECF No. 61, Ex. 13; David Bock

Decl. ¶ 19, Oct. 8, 2010, ECF No. 60-1 ("Bock Decl."). Prior to filing this action,

plaintiffs sent to each defendant bookseller a letter threatening a possible lawsuit,

together with a copy of the draft complaint. Compl. ¶¶ 47, 50; Pls.' Opp'n to Amazon

Stmt Mat. Facts ("SMF") ¶ 11, ECF No. 61-5; Pls.' Opp'n to B&N SMF ¶ 14, ECF No.

77-4. Those bookseller defendants, however, are not fungible, nor are the allegations

against them.

   With respect to Books-A-Million, plaintiffs allege in their complaint that "BAM

makes false and defamatory statements regarding plaintiffs," including the allegedly

defamatory promotional statement recounted above. Compl. ¶ 38. According to

plaintiffs, "[t]he defamatory statements were made and published by defendants with

knowledge of their falsity or with reckless disregard for their truth." *Id.* ¶ 45. Plaintiffs

also allege that BAM, as well as the other defendants, benefited and profited from the

Sinclair book and other defamatory statements. *Id.* ¶ 46. Unlike the other defendants,

however, plaintiffs make no allegations regarding BAM's submission guidelines.

   As for Barnes & Noble, it sells books both electronically and in hard copy via its

website, www.barnesandnoble.com, as well as its retail stores. Bock Decl. ¶ 4. In

addition to books published by traditional publishers, B&N offers for sale books by small

and/or self publishers that are printed by print-on-demand printers such as Lightening

Source. *Id.* ¶¶ 7-8. B&N offers approximately 3.6 million print-on-demand books for

3

sale on its website; hundreds of thousands of these books are from Lightening Source. *Id.* ¶ 8.  B&N plays an active role in determining which books are stocked in its retail stores, and accordingly requires publishers seeking to have their books carried in retail stores to follow the procedures plaintiffs cite in their complaint.  *Id.* ¶ 9; *see* Compl. ¶ 40.

B&N.com has a display page for each book offered for sale on its website.  Bock Decl. ¶ 10.  B&N receives information in standard electronic format from publishers or companies like Lightening Source.  *Id.* ¶ 11.  A single file usually contains data for numerous books.  *Id.*  B&N uploads the data directly to its website in an automated fashion after scanning for unrecognizable characters or other technical issues.  *Id.* ¶ 12. B&N does not review third-party content received in this way unless it receives a customer complaint; then, a B&N employee will review the content solely to determine if it complies with company policy.  *Id.* ¶ 13.

B&N sold the Sinclair book online but not in its retail stores.  *Id.* ¶ 17.  Consistent with the above-described process, B&N received an electronic file from Lightening Source that contained descriptive material related to the Sinclair book on July 1, 2009 and uploaded it to its website in an automated fashion.  *Id.* ¶¶ 18-19; Ex. C, ECF No. 60-4.  B&N did not review or edit the text prior to posting it online.  Bock Decl. ¶ 23.  The file contained identical paragraphs under the headings "From the Publisher" and "Synopsis"; each paragraph contained the allegedly defamatory sentence above.  *Id.* ¶ 19. B&N did not write those paragraphs or contribute to them in any way.  *Id.* ¶ 20.  It did not actively solicit the submission, encourage defamatory statements, or communicate

with Sinclair, his publishing company, or Lightening Source regarding the content of the promotional statements. *Id.* ¶ 22.

Plaintiffs have submitted a video from YouTube of Sinclair stating that he was in the process of having B&N carry his book in their retail stores. Pls.' B&N Opp'n, Ex. Y, ECF No. 77-3. However, B&N found no records indicating that Sinclair followed through and contacted B&N about having his book placed in their retail stores. *See* Bock Decl. ¶ 17. Sinclair also contacted a B&N retail store in Georgia regarding a false third-party report that B&N would not order the Sinclair book for customers. Pls.' B&N Opp'n, Ex. X, ECF No. 77-3; B&N Reply 23, ECF No. 86.

Finally, Amazon is also a retailer of books and other products. Daphne Durham Decl. ¶ 4, Sept. 1, 2010, ECF No. 53-4 ("Durham Decl."). However, unlike the other bookseller defendants, Amazon does not operate any bricks-and-mortar stores; all of its retail business transactions are conducted via the Internet. *Id.* ¶ 4. Once ordered via the Internet, hard-copy books are sent to customers via the mail or other non-electronic shipping companies. *See* Pls.' Opp'n to Amazon SMF ¶ 5. In addition to hard-copy books, Amazon also offers electronic versions of books that can be uploaded on to electronic wireless reading devices like the Kindle. Durham Decl. ¶ 6. The Sinclair book was offered in both hard-copy and Kindle format. Compl. ¶¶ 34, 36; Amazon Reply 15, ECF No. 72. As a general matter, Amazon does not review the substance of the listed book, the product description, the product details, or the customer reviews. Durham Decl. ¶ 7. Consistent with that practice, Amazon did not review the substance of the Sinclair book, its online listing, or promotional materials. *Id.* ¶ 8. The Amazon.com

listing for the Sinclair book included the allegedly defamatory sentence above.  Compl. ¶ 35.

The content of the online listing for the Sinclair book was delivered through a direct electronic feed to Amazon's servers from Lightening Source, a print-on-demand company.  Durham Decl. ¶ 9.  The material provided by Lightening Source included bibliographic data as well as a promotional product description.  *Id.*; *see also id.*, Ex. 2. The material was automatically pulled into Amazon.com's listing of the Sinclair book after it was received.  *Id.* ¶ 10.  Shortly after it was received, an Amazon employee deleted duplicate paragraphs from the editorial review section; no other edits were made. *Id.* ¶ 11.  Customer reviews of the book are submitted through an online process by Amazon customers.  *Id.* ¶ 12.  Amazon may review those customer submissions.  Pls.' Amazon Opp'n, Ex. 21, ECF No. 61-4.

## ANALYSIS

### 1. Legal Standard for a Motion to Dismiss

BAM moves to dismiss the complaint against it for failure to state a claim.  A court may dismiss all or part of a complaint that "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In considering a motion to dismiss, the court may only consider "the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice."  *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).  To survive a motion to dismiss made pursuant to Rule 12(b)(6), a complaint must "plead[] factual content that allows the court to draw the reasonable inference that the

6

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949

(2009). In evaluating a Rule 12(b)(6) motion, the Court construes the complaint "in favor

of the plaintiff, who must be granted the benefit of all inferences that can be derived from

the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal

quotation marks omitted). However, factual allegations, even though assumed to be true,

must still "be enough to raise a right to relief above the speculative level." *Bell Atl. Corp.*

*v. Twombly*, 550 U.S. 544, 555 (2007). Moreover, the Court "need not accept inferences

drawn by plaintiff[] if such inferences are unsupported by the facts set out in the

complaint. Nor must the court accept legal conclusions cast in the form of factual

allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## 2. Legal Standard for a Motion for Summary Judgment

B&N and Amazon move for summary judgment on all claims against them.

Summary judgment is proper where the moving party shows "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Though the Court must draw all justifiable inferences in favor of the non-moving party in

deciding whether there is a disputed issue of material fact, "[t]he mere existence of a

scintilla of evidence in support of the [non-movant]'s position will be insufficient; there

must be evidence on which the jury could reasonably find for the [non-movant]."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." *Id.* at

249-50 (citations omitted).

**3. Claims relating to the product description of the Sinclair book.**

The bookseller defendants seek dismissal of the claims pertaining to the book's product description based on immunity under the Communications Decency Act ("CDA"), 47 U.S.C. § 230, which provides in relevant part: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." *Id.* § 230(c)(1). An "interactive computer service" is defined as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server," while an "information content provider" is defined as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." *Id.* § 230(f)(2)-(3).

In passing the CDA, Congress "made the legislative judgment to effectively immunize providers of interactive computer services from civil liability in tort with respect to material disseminated by them but created by others." *Blumenthal v. Drudge*, 992 F. Supp. 44, 49 (D.D.C. 1998); *see also Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1122 (9th Cir. 2003) ("Congress granted most Internet services immunity from liability for publishing false or defamatory material so long as the information was provided by another party. As a result, Internet publishers are treated differently from corresponding publishers in print, television and radio."). Under the law, "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions—such as deciding whether to publish, withdraw, postpone or alter

8

content—are barred." *Blumenthal*, 992 F. Supp. at 50 (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997)). To resolve whether immunity under CDA applies, a Court must determine whether: (1) the defendant is a provider of an interactive computer service; (2) the statements at issue were created by an information content provider; and (3) the plaintiffs seek to hold the defendant liable as "a publisher or speaker of third party content." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 564 F. Supp. 2d 544, 548 (E.D. Va. 2008) (citing *Schneider v. Amazon.com*, 31 P.3d 37, 40 (Wash. 2001)) *aff'd*, 591 F.3d 250 (4th Cir. 2009). The Court may consider CDA immunity on a 12(b)(6) motion if those facts are apparent from the face of the complaint. *Id.* at 550. Unfortunately for the plaintiffs, they are!

First, as to BAM, the parties do not contest that the first and third prongs of the CDA immunity inquiry are satisfied. The issue is simply whether the complaint sufficiently alleges that BAM is an information content provider of the product description at issue, and therefore not entitled to immunity. *See* Pls.' BAM Opp'n 17-21, ECF No. 43. BAM argues that the complaint only alleges that the promotional statement appeared on its website, and wholly lacks any allegation that BAM "wrote, distributed or originated" the promotional statement. BAM's Reply 6, ECF No. 49. BAM also points to a complaint filed in a related action before this Court to demonstrate that it did not play a role in the creation or development of the allegedly defamatory promotional statements. *See* BAM Mot., Ex. A ¶ 35, ECF No. 34-2 (*Parisi et al. v. Ingrahm Content Group et al.*, 10cv974 (RJL), Compl.). The complaint in that case claims that two other parties "wrote, distributed and/or published" the promotional statements. *Id.*

9

While this Court will not accept the allegations in a complaint in another case as true per se, this complaint unquestionably lacks sufficient factual content to allow the reasonable inference that BAM is liable. How so? First, plaintiffs fail to allege that BAM was involved with the creation or development of the promotional statements as would be required for BAM to be an information content provider under the CDA. Instead, plaintiffs merely allege that BAM "made and published" the statements on its website. Compl. ¶ 45; *see also id.* ¶ 38 ("BAM makes false and defamatory statements regarding plaintiffs, including without limitation, that: 'You'll read how the Obama campaign used internet porn king Dan Parisi and Ph.D. fraud Edward I. Gelb to conduct a rigged polygraph exam in an attempt to make the Sinclair story go away.'"). Moreover, the complaint also alleges that both Amazon and B&N published the exact same language on their respective websites. *See id.* ¶¶ 35, 36, 39. Second, nowhere does the plaintiff allege that BAM had any role or responsibility whatsoever in even editing the promotional statement, let alone creating or developing it. Moreover, the facts alleged, as outlined above, cannot reasonably give rise to the inference that BAM in fact did.

Plaintiffs also attempt to claim that CDA immunity should be withheld because BAM adopted the promotional statements as its own. However, they cite no applicable law for this proposition. Indeed, it would be contrary to the purpose of the CDA, which sought to encourage the "'vibrant and competitive free market' of ideas on the Internet," *Nemet Chevrolet*, 591 F.3d at 253 (quoting 47 U.S.C. § 230(b)(2), by establishing immunity for internet publication of third-party content to require a fact-based analysis of if and when a defendant "adopted" particular statements and revoke immunity on that

10

basis. Accordingly, BAM is entitled to immunity under the CDA for the tort claims related to the allegedly defamatory statements published on its website.

Second, as to B&N and Amazon, there is similarly no dispute that either B&N or Amazon was the information content provider of the allegedly defamatory statements at issue. Indeed, B&N has submitted a declaration from David Bock, Vice-President of Content Technology at barnesandnoble.com llc, which describes the process through which B&N received the promotional statements (including the allegedly defamatory statement) from the third-party print-on-demand company Lightening Source. Bock Decl. ¶¶ 10-23. B&N received the allegedly defamatory statements as part of a paragraph description of the book from Lightening Source via email. *Id.* ¶ 18; B&N Mot., Ex. C. B&N then automatically uploaded the material, without editing it, onto their website. Bock Decl. ¶¶ 19-23. It did not actively solicit the submission, encourage defamatory statements, or communicate with Sinclair, his publishing company, or Lightening Source regarding the content of the promotional statements. *Id.* Like B&N, Amazon received the allegedly defamatory statements published on its website from Lightening Source. Durham Decl. ¶¶ 9-10. An Amazon employee deleted duplicate paragraphs but did not otherwise alter the content received. *Id.* ¶ 11.

In short, plaintiffs have put forth no evidence that disputes the fact that B&N and Amazon did not play a role in the "creation or development" of the *promotional statements* (including the allegedly defamatory statement).[1] Accordingly, B&N and

---

[1] The Court has previously struck several of plaintiffs' exhibits of one of Sinclair's blog postings claiming to have contacted B&N and Amazon employees regarding customer

Amazon are entitled to summary judgment on claims relating to the allegedly defamatory promotional statements appearing on their websites.

### 4. Right of publicity claim.

Plaintiff Parisi also argues that his false light claim is, in essence, a right of publicity claim, which is a state law intellectual property right and therefore not covered by the CDA. Pls.' B&N Opp'n 25.[2] Though the immunity provided under the CDA is broad, Congress has instructed that it should not be "construed to limit or expand any law pertaining to intellectual property." 47 U.S.C. § 230(e)(2). Courts are divided, however, as to whether the carve out of CDA immunity applies to both state and federal intellectual property laws or only federal intellectual property laws. For example, the Ninth Circuit recently decided to "construe the term 'intellectual property' to mean 'federal intellectual property'" in light of the Congressional purpose of CDA immunity. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118-19 (9th Cir. 2007) (because "state laws protecting 'intellectual property,' . . . are by no means uniform" and "[b]ecause material on a website may be viewed across the Internet, and thus in more than one state at a time, permitting the reach of any particular state's definition of intellectual property to dictate the contours of [the CDA] immunity would be contrary to Congress's express goal of

---

reviews of his book. *See* Minute Order, Dec. 6, 2010; Minute Order, Mar. 30, 2011. Even assuming, however, that these facts were available in an admissible format, the fact that Sinclair contacted the booksellers about *customer reviews* does not create a genuine dispute of fact as to whether the booksellers are the information content providers of the *promotional statements* alleged to be defamatory.

[2] Defendants argue that plaintiff has not adequately pleaded a right of publicity claim, however, a liberal reading of the complaint could be construed to provide notice of such a claim. *See* Fed. R. Civ. P. 8.

insulating the development of the Internet from the various state-law regimes."). By

comparison, several district courts in the First and Second Circuits have declined to adopt

such a narrow view, choosing instead to interpret § 230(e)(2) as applying to both federal

and state intellectual property law. *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F.

Supp. 2d 690, 703-04 (S.D.N.Y. 2009); *Doe v. Friendfinder Network, Inc.*, 540 F. Supp.

2d 288, 299-300 (D.N.H. 2008); *see also Universal Commc'n Sys., Inc. v. Lycos*, 478

F.3d 413, 422-23 (1st Cir. 2007) (stating in dicta that "[c]laims based on intellectual

property laws are not subject to Section 230 immunity.").

Not surprisingly, defendants urge a narrow interpretation of the term "intellectual

property" in line with that of the Ninth Circuit. Alternatively, they advocate a finding

that the use of plaintiff Parisi's name falls within the newsworthiness or incidental use

exceptions. *See, e.g.*, B&N Mot. 22, ECF No. 60. While I am not inclined to extend the

scope of the CDA immunity as far as the Ninth Circuit, I do find for the following

reasons that the use of Parisi's name is easily protected by the newsworthiness privilege.

"The newsworthiness privilege applies to advertisements for books, films, and other

publications concerning matters of public interest. A plaintiff cannot recover for

misappropriation based upon the use of his identity or likeness in a newsworthy

publication unless the use has 'no real relationship' to the subject matter of the

publication." *Lane v. Random House, Inc.*, 985 F. Supp. 141, 146 (D.D.C. 1995)

(citation omitted). Sinclair's book, which made allegations about a presidential candidate

that were, in and of themselves, widely publicized, was clearly newsworthy. Given that

Parisi has, in his complaint, admitted his involvement with Sinclair's polygraph—and

indeed, that he initiated contact with Sinclair "as part of its effort to develop a political website,"—he cannot claim that use of his name has "no real relationship" to Sinclair's book. Accordingly, any right of publicity claim must be dismissed as protected by the newsworthiness protection.

## 5. Claims relating to the distribution of the Sinclair book.

Unable to make out a successful publication claim against the bookseller defendants, plaintiffs next seek to establish liability based on the defendants' distribution of the Sinclair book.[3] To be liable for the defamation of a public figure[4], a distributor of allegedly defamatory material must act with "'actual malice'—that is, with knowledge that [the material] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *see also Zeran*, 129 F.3d at 331 ("Distributors cannot be held liable for defamatory statements contained in the materials they distribute unless it is proven at a minimum that they have actual

---

[3] Relying on *Gentry v. eBay, Inc.*, 121 Cal. Rptr. 2d 703 (Cal. Ct. App. 2002), defendants B&N and Amazon urge the Court to extend CDA immunity to sales of the physical book (as well as Amazon's Kindle version of the book) because the underlying *transactions* took place on the internet. However, the Court declines to do so. Liability for sales of a product do not, in the Court's view, fall under the province of the CDA because such claims do not treat the defendants "as the publisher or speaker" of third-party information. 47 U.S.C. § 230(c)(1). In *Gentry*, the California Court of Appeal found that the CDA prohibited a claim against eBay for violating a state warranty statute. 121 Cal. Rptr. 2d at 712-16. However, eBay was not the seller of the items at issue, but instead provided the online marketplace where third-parties could list and sell goods to customers. By contrast, while B&N and Amazon rely on third-parties for their product descriptions and are therefore entitled to immunity under the CDA for the *product descriptions appearing on their website*, they are also the distributors of the books and cannot rely on CDA immunity as a defense to plaintiffs' distributor-based claims.
[4] Plaintiffs concede, for the purposes of these motions, that they are limited-purpose public figures.

knowledge of the defamatory statements upon which liability is predicated.") (citation omitted). "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). "Moreover, because the actual malice inquiry is subjective—that is, concerned with the defendant's state of mind when he acted—the inference of actual malice must necessarily be drawn solely upon the basis of the information that was available to and considered by the defendant prior to publication." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1508 (D.C. Cir. 1996); *see also Secord v. Cockburn*, 747 F. Supp. 779, 792 (D.D.C. 1990) (because arguing the existence of actual malice based on subsequent determination that a source or statement was false "would be tantamount to conflating the actual malice and falsity elements of a libel action . . . it is hornbook libel law that post-publication events have no impact whatever on actual malice" and the existence of actual malice "must be determined as of the date of publication.").

The origin of the actual malice requirement is, of course, the First Amendment's protections of free speech and press, for, as the Supreme Court has observed, anything short of actual malice would impose a tremendous burden on distributors such as booksellers to make themselves aware of the contents of the material they distribute. *Smith v. California*, 361 U.S. 147, 153 (1959). That burden, in turn, "would become the public's burden, for by restricting [the bookseller] the public's access to reading matter would be restricted." *Id.* Furthermore, because "[a]t the heart of the First Amendment is

15

the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern," plaintiffs cannot circumvent the constitutional requirement of actual malice in seeking recovery for other torts associated with the defendants' distribution of allegedly defamatory material. *Hustler Magazine v. Falwell*, 485 U.S. 46, 50-57 (1988).

Here, plaintiffs have, for the following reasons, utterly failed to satisfy their respective burdens in alleging or establishing genuine disputes as to malice, and accordingly, their claims against all three bookseller defendants must be dismissed. First, with respect to BAM, plaintiffs have failed to allege facts sufficient to support the reasonable inference that BAM had actual knowledge of, or acted with reckless disregard to, the falsity of the statements at issue. Instead they merely make conclusory allegations as to BAM's knowledge (*see, e.g.*, Compl. ¶¶ 47, 49, 58, 67, and 72), omitting, significantly, any facts that might establish—either directly or circumstantially—BAM's actual malice. Indeed, the complaint itself is devoid of any such facts that would hint, let alone support the reasonable inference, that BAM knew or seriously doubted the truth of the allegedly defamatory statements contained in the book. Plaintiffs argue, in their opposition to all three bookseller defendant motions, that under the Restatement of Torts, a distributor may face liability for distribution of defamatory material if the work is written or published by "a particular author or a particular publisher has frequently published notoriously sensational or scandalous books." Restatement (Second) of Torts § 581 cmt. e (1977). However, not only have plaintiffs failed to cite any applicable case law adopting such a standard in this district, but, with respect to BAM, they have also

failed to allege that Sinclair had ever before authored a "notoriously sensational or scandalous book" in the past, let alone that he was a *frequent* publisher of such works.[5] Accordingly, because the plaintiffs have failed to allege facts in the complaint supporting the inference that BAM acted with actual malice, the remaining claims against BAM must be dismissed.

Second, with respect to B&N, it argues that plaintiffs have failed to even allege sufficient facts supporting the inference of actual malice in the complaint. I agree. Even assuming, however, that the complaint, on its face, was sufficient to withstand a motion to dismiss, plaintiffs' claims must nevertheless be dismissed on summary judgment because they have failed to establish a genuine dispute as to B&N's actual malice. Plaintiffs argue that such a dispute as to B&N's knowledge exists because: (1) B&N's General Counsel received a copy of the draft complaint in this case as well as a demand letter from plaintiffs' counsel; (2) customer reviews appearing on B&N's website gave it constructive notice that the book was defamatory; (3) Sinclair's book was not published by a "reputable" publisher, and the book itself was "notoriously sensational or scandalous" and the subject of wide public discussion prior to publication; (4) defendant Rense, who wrote the forward to the book, was similarly not reputable; and (5) Sinclair

---

[5] Plaintiffs attached 20 exhibits to their opposition to BAM's Motion to Dismiss, nearly all of which BAM moved to strike. *See* BAM's Mot. to Strike, ECF No. 50. The majority of the exhibits are internet press and blog coverage of Sinclair and his allegations about Barack Obama that plaintiff seeks to introduce as material to BAM's involvement in the creation and development of the allegedly defamatory synopsis of the Sinclair book. Pls.' Opp'n to BAM's Mot. to Strike, ECF No. 54. However, those exhibits contain no indication that BAM was involved in the development of the synopsis, nor do they suggest that the book was defamatory towards plaintiffs such that BAM would have reason to know of the alleged defamation.

and a blogger had various contacts with B&N employees regarding the sales and customer reviews of the book.[6] Pls.' B&N Opp'n 3-5, 11-18.

However, plaintiffs' first two "bases" of knowledge—the demand letter and draft complaint sent to B&N's general counsel, and the customer reviews posted on B&N's website—do not establish a genuine dispute of material fact. Even assuming that such correspondence is sufficient to put a distributor on notice that a book is defamatory[7]—which is to say the least, highly doubtful—both occurred *after* B&N began distribution of the Sinclair book. Our Circuit's precedent, however, requires that actual malice by a *publisher* exist at the time of publication. *McFarlane*, 91 F.3d at 1508. Obviously that requirement can be no *less* stringent for a distributor. Thus, post-publication/post-distribution correspondence cannot establish a dispute as to actual malice. Second, plaintiffs' reliance on the nature of the Sinclair book itself similarly fails to establish any genuine dispute as to B&N's malice. Indeed, "the character and content of the publication" at issue is a "constitutionally impermissible evidentiary basis for a finding of actual malice." *Washington Post Co. v. Keogh*, 365 F.2d 965, 969 (D.C. Cir. 1966). Similarly, plaintiffs' claims that because Sinclair, his publisher, and the author of the

---

[6] Plaintiffs also cite to a Kansas state court case, *Brandewyne v. Author Solutions*, No. 04-cv-4363 (18th Judicial District Ct., Kansas Aug. 3, 2006), *available at* ECF No. 61, Ex. 19. That case, however, is inapplicable and therefore unpersuasive for a number of reasons, including the fact that the court in that case was assessing punitive damages against a *publisher* who had failed to investigate prior to publication but after warnings from the book's own author that the book may contain defamatory material and had already been turned down by another publisher due to concerns of libel. The motions at issue concern *distributors*, not *publishers*.

[7] Defendants also object to the admissibility of such evidence on a number of grounds, including that they are "unsubstantiated, unverified and unverifiable, and double, triple, or even quadruple hearsay." B&N Reply 22 n.11.

forward to his book, Rense, were not "reputable" does nothing to advance their claim that B&N entertained serious doubts as to the veracity of Sinclair's book.  Not only was B&N under no legal obligation to make itself aware of those parties' reputations, but furthermore, as discussed above, actual malice is a subjective standard that must be shown in the mind of the defendant.  B&N contends, and I agree, that plaintiffs must demonstrate actual malice in a high-level employee in order to attribute actual malice to the corporation.  B&N Reply 19-20 (citing *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 139-40 (2d Cir. 1984) ("The essential inquiry is whether *those in charge* of [defendant distributor] had serious doubts about the accuracy of the identification . . .")).  Because actual malice is a subjective inquiry, knowledge of falsity (or reckless disregard thereof) must necessarily exist in the mind of someone in charge.  Fortunately, however, the set of employees whose knowledge can constitute actual malice on behalf of a corporation need not be delineated here.  Plaintiffs merely attempt to create a genuine dispute with respect to actual malice by pointing to blog postings by Sinclair and others describing communications with or emails sent to B&N employees.  *See* Pls.' Opp'n to B&N SMF ¶¶ 5-8; *see also supra* note 1.  Because this correspondence relates solely to the nature of the customer reviews and B&N's treatment of those reviews, however, and does not deal with the statements the plaintiffs allege are defamatory, it does not demonstrate a genuine issue as to B&N's actual malice.  Accordingly, B&N is entitled to summary judgment on plaintiffs' distribution claims as well.

Finally, plaintiffs present similar arguments in an attempt to create a dispute of material fact as to Amazon's distributor liability.  *See* Pls.' Amazon Opp'n 13-17

(arguing that Amazon's knowledge of the allegedly defamatory nature of Sinclair's book can be shown by the customer reviews posted, that Sinclair's book was not published by a "reputable" publisher, and the book itself was "notoriously sensational or scandalous" and the subject of wide public discussion prior to publication, and that Sinclair and Rense are not reputable). In addition, plaintiffs argue that the declaration accompanying Amazon's motion, which states that Amazon "did not in any way review the substance of the Sinclair book or its associated online listing and promotional materials," is insufficient to prove that, in fact, Amazon did not review the book. Pls.' Opp'n to Amazon SMF ¶ 13. However, they are unable to advance anything but argument to refute the fact. Accordingly, plaintiffs have failed to carry their burden as to this issue. Finally, for the reasons discussed above as to B&N, plaintiffs' other arguments are similarly anemic to sustain their burden in demonstrating a genuine dispute as to Amazon's actual malice.

## CONCLUSION

For the foregoing reasons, BAM's Motion to Dismiss, ECF No. 34, Amazon's Motion for Summary Judgment, ECF No. 53, and B&N's Motion for Summary Judgment, ECF No. 60, are GRANTED. An appropriate order will accompany this memorandum opinion.

RICHARD J. LEON
United States District Judge