UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


DANIEL PARISI, ET AL.,           :    Docket No. CV10-897
                                 :    (RJL)
              Plaintiffs,        :
                                 :    February 28, 2011
                                 :
v.                               :    11:00 a.m.
                                 :
LAWRENCE W. SINCLAIR, ET AL.,    :
                                 :
              Defendants.        :
. . . . . . . . . . . . . . . . .


TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE RICHARD J. LEON
UNITED STATES DISTRICT JUDGE


APPEARANCES:


For the Plaintiffs:          RICHARD J. OPARIL
                             Patton Boggs, LLP
                             2550 M Street, NW
                             Washington, DC 20037


For the Defendant
Books-A-Million:             RALPH W. KALISH, JR.
                             Husch Blackwell Sander,LLP
                             150 Carondelet Plaza
                             St. Louis, Missouri 63105

For the Defendant
Amazon.com, Inc.:            MATTHEW J. SEGAL
                             Pacifica Law Group, LLP
                             1191 2nd Avenue
                             Seattle, Washington 98101

```
For the Defendant
Barnes & Noble, Inc.:          LINDA STEINMAN
                               Davis Wright Tremaine, LLP
                               1633 Broadway
                               New York, New York 10019

For the Defendant
Jeffrey Rense:                 CHRISTINA BOLMARCICH
                               Semmes Bowen & Semmes
                               25 South Charles Street
                               Baltimore, Maryland 21201


Court Reporter:                PATTY ARTRIP GELS, RMR
                               Official Court Reporter
                               Room 4700-A, U.S. Courthouse
                               Washington, D.C. 20001
                               (202) 962-0200
```

Proceedings reported by machine shorthand, transcript produced by computer-aided transcription.

P R O C E E D I N G S

COURTROOM DEPUTY:  Calling civil case 10-897 Daniel Parisi, et al. Versus Lawrence W. Sinclair, et al.  Would counsel please come forward and identify yourself for the record?

MR. OPARIL: Good morning, your Honor, Richard Oparil from Patton Boggs for the Plaintiff.

THE COURT:  Welcome.

MS. STEINMAN:  Good morning, your Honor, Linda Steinman from Davis Wright Tremaine for Barnes & Noble.

THE COURT:  Welcome.

MR SEGAL:  Good morning, your Honor, Matt Segal from K & L Gates for Amazon.com.

THE COURT:  Welcome.

MR. KALISH:  Good morning, your Honor, Ralph Kalish for Books-A-Million.

THE COURT:  Welcome.

MR. LAWRENCE:  Good morning, your Honor, Lawrence W. Sinclair Pro Se.

THE COURT:  Welcome.  All right, counsel.  As my law clerk has indicated, a half hour for each side and the moving party gets to do a five-minute rebuttal for each party so that's 15 minutes.  You guys go first.  Plaintiffs go first and divide it up any way you want.

MR. SEGAL: Thank you, your Honor, and again good

1    morning, Matt Segal from K & L Gates representing Amazon.com.

2         THE COURT: All right.

3         MR. SEGAL: Amazon respectfully requests that this Court

4    grant its Motion for Summary Judgment and dismiss all claims

5    against it.  Segal.  We live in a world today, your Honor, where

6    it has never been more apparent that the broad protections

7    afforded to both book sellers and distributors of information

8    over the internet must be construed broadly as intended

9    originally by the protections of the First Amendment and now as

10   represented by the Congressional policies underpinning the

11   Communications Decency Act.

12         Amazon is an excellent example of why this is so.  We

13   make 30 million titles available through our website and,

14   therefore, without the immunity afforded by the Communication

15   Decency Act we cannot continue to make available the volume of

16   content that we are describing here.

17         Immunity is important to recognize I think also as the

18   Fourth Circuit elaborated in the Nemet Chevrolet case is not

19   just an affirmative defense to liability.  It means immunity

20   from suit so, therefore, that is a reason to look at these

21   issues early as the Court is doing here and not expose purveyors

22   of information to extensive prolonged and expensive discovery or

23   litigation proceedings.

24         With that backdrop in mind, your Honor, I would like to

25   summarize briefly the key facts in the record with respect to

1    Amazon.com and then I will discuss the elements of the

2    Communications Decency Act as applied to those key facts.  The

3    book that we are here talking about today is a self-published

4    work Mr. Sinclair.  It was provided in digital form to

5    Amazon.com and also sold in hard copy form, but all transactions

6    were through the internet.

7         All of the content it is undisputed on the record

8    before the Court be it promotional content or the content of the

9    book itself was created and developed by others, and this is not

10   a conclusory statement as the Plaintiffs suggest in their

11   briefing with respect to Amazon.com.  For example, the record

12   clearly identifies and accounts for each piece of copy that's at

13   issue here.  I will briefly take the Court through that.

14        The Durham declaration is the key place to look --

15   Durham,  that's Daphne Durham.  Paragraph nine of her

16   declaration talks about where we got the cover image and the

17   product description and the product details, and that was all

18   from a print on demand party lightning source which is a

19   Defendant actually in another case before this Court right now.

20   That was provided through an electronic feed.

21        We gave the Court a copy of a screen shot showing that

22   feed.  The declaration of David Bach submitted by Barnes & Noble

23   also identifies the same feed with the exact same copy.

24   Paragraph ten of the Durham declaration talks about the

25   editorial reviews of the books and explains how those were

1    submitted through a catch all e-mail system that posts them on

2    to the internet.

3            Paragraph 12 of the  Durham declaration talks about the

4    various customer reviews posted on the website and explains how

5    those were posted by third party online users of the Amazon

6    website.  Paragraph six of the Durham declaration as well as

7    paragraph four of the Tolleson declaration T O L L E S O N talk

8    about the digital content of the book and how that was provided

9    through an upload to Amazon.com.

10           So with this background in mind, let me turn to the

11   application of the elements of the Communications Decency Act to

12   that record.  There are three elements of the statute.  The

13   first element requires that we, Amazon the party seeking

14   immunity, be an interactive computer service and there is no

15   doubt that we are.  Numerous Courts have held that web sites are

16   interactive computer services including specifically that Amazon

17   is an interactive computer service and that point is really not

18   disputed at all by the Plaintiff in the briefing nor should it

19   be.

20           The second element is do the claims for which immunity

21   is sought attempt to treat the Defendant as a publisher or

22   speaker of information? This is a key dividing line here, and it

23   separates those claims that may not be subject to immunity from

24   those that are and it is consistent again with the policy

25   intentions of Congress to make sure that liability for content

1    is not imposed on the disseminator of the information.

2         And there is no question again that the claims pleaded

3    before this Court attempt to hold Amazon as well as the other

4    booksellers liable for the content as if they were the speaker

5    or the publisher of the book and the promotional statements,

6    which they are not.

7         And one can look to the complaint to verify this.  For

8    example, paragraph 55 which is the liable claim, the core claim

9    in the case, Defendants plural published the defamatory

10   statements in Sinclair's book and promotional statements.

11   Paragraph 66, the false light claim, published defamatory

12   statements concerning Parisi placed him in a false light.

13        71, business disparagement.  Defendants and each of

14   them knowingly and intentionally published multiple defamatory

15   written statements and so on.

16        These causes of action are claims that attempt to hold

17   us responsible for the content as if we were a speaker or

18   publisher so they fall within that second element of the

19   statute.  Now, Plaintiffs have not really disputed that with

20   respect to the claims in the complaint.  They have said, well,

21   we should be permitted to add additional claims, which they have

22   not moved the Court to do prior to the stay that was entered,

23   but the two additional claims that were identified in opposition

24   to Amazon.com's Motion would not change anything.

25        One of those is an alleged right of publicity.  That's

1    a type of state intellectual property claim.  The Ninth Circuit

2    in the Perfect Ten case confirmed that those claims would also

3    be barred by Communications Decency Act.  That is to my

4    knowledge the only Circuit Court that has definitively answered

5    that question.  Admittedly there are some  District Courts that

6    go the other way, but even if the Court were to adopt the

7    District Court position, the claims would be futile as asserted

8    here against Amazon.com because, as demonstrated in Barnes &

9    Noble's briefing, there is a newsworthiness and incidental use

10   exception that would clearly apply to any claim for

11   appropriation here.  This is really not an intellectual property

12   case.  Again, this is a case alleging false content was

13   distributed.

14          And the other claim that the Plaintiffs attempt to

15   suggest could change matters as far as the current state of

16   pleading is a breach of contract claim.  They assert that they

17   would be a third party beneficiary to our digital terms and

18   conditions.  That, as we have shown in our brief, is barred by

19   not only the terms of the contract which expressly state there

20   are no beneficiaries, but also Washington State law, which is

21   the governing law for that contract and which holds that in the

22   event that the parties exclude third-party beneficiaries, there

23   are no  beneficiaries.

24          I would also note the Schneider case from the

25   Washington Court of Appeals that we seat cited in our briefing

1  which found that a breach of contract claim asserted against

2  Amazon when it was part and parcel of a defamation cause of

3  action would also be barred by the CDA.  For all those reasons,

4  any amendment would be futile, and there are no claims that fall

5  outside the core speaker or publisher requirement, the second

6  element of the statute is satisfied.

7      So I turn to the third element which is was Amazon a

8  creator or developer of the content at issue? And the answer to

9  that again is no.  We did not create or develop this content

10  simply by posting it online, making it available through an

11  online transaction, or by performing those limited technical

12  edits that we have identified.  If we had actively solicited

13  illegal content, that might be a different story.

14      For example, in the Roommates case from the Ninth

15  Circuit which the Plaintiffs cite, which both parties cite,

16  that's the standard that Judge Kozinski elaborated there.  He

17  said that if you are, for example, encouraging actively parties

18  to submit content that would violate the Fair Housing Act in

19  order to even access your website by requiring them to fill out

20  a questionnaire that calls for illegal criteria about what sort

21  of housing they are looking for, that might make you a creator

22  or developer; but simply performing what would be considered

23  normal editorial type of functions technical editing, for

24  example, does not take you outside the scope of immunity, nor

25  does the concept that you have ratified content simply by

1    placing it on your website. That would eviscerate the immunity

2    altogether.

3            I believe that this District Court in Ramey versus

4    Darkside talked about the fact that simply because you put

5    something on your website, even if you put your e-mail address

6    on it or a watermark on it, that doesn't take you outside the

7    scope of immunity.  That's a well reasoned decision, and so I

8    would also note that Plaintiffs raised the question about the

9    application of the CDA to the content of the book itself, and I

10   would emphasize here that the language of the statute says that

11   the liability is precluded when the information is provided

12   through the internet, not on, but through; and that's a key term

13   particularly when all the cases say that the statute must be

14   interpreted and applied broadly and in favor of immunity.

15           So under those circumstances, your Honor, all three of

16   the elements of the CDA are met, and Amazon.com should receive

17   immunity and should be granted Summary Judgment.

18           Moreover, in closing I take this Court back to the

19   words of this District in the Drudge decision, Blumenthal versus

20   Drudge, which said the CDA was passed in part to prevent

21   interactive computer services from having to make quote,

22   "ceaseless choices of suppressing controversial speech or

23   sustaining prohibitive liability."

24           And that's quoting the Zarin decision from the Fourth

25   Circuit which talks about not requiring those who disseminate

1    content online to have to make snap face judgments every time

2    somebody contacts them and says this may be false, that may be

3    false, not requiring them to investigate as if they were a news

4    editor, for example, and here really the facts of the case bear

5    this out.

6         Amazon.com should not be required nor should any other

7    book seller be required, for example, to conduct an

8    investigation into the truth or falsity of whether Mr. Parisi is

9    or is not a pornographer and at what relevant times he

10   distributed pornography.  That is a burden that is too high for

11   somebody that sells 30 million titles.  Amazon.com therefore

12   respectfully requests again that  this Court grant Summary

13   Judgement.  If the Court has questions.

14        THE COURT:  Let me ask you this.  Is it your theory

15   that as to your client the only way the Court can grant Summary

16   Judgment is to conclude that your client is entitled to immunity

17   or are there other ways that the Court could grant Summary

18   Judgment in your favor without reaching the issue of whether or

19   not your client is entitled to immunity under the --

20        MR SEGAL:  There are certainly other ways, your Honor,

21   and the other way I think will be capably explained by Ms.

22   Steinman on behalf of Barnes & Noble which is that --

23        THE COURT:  So you are not limiting yourself just to

24   this theory in terms of the result you are seeking to

25   accomplish?

1    MR SEGAL:  Your Honor, if the Court were to conclude

2    that Barnes & Noble was correct that, as I think the Court

3    should, that there is a requirement that in order to proceed

4    against the sellers, the Plaintiffs must demonstrate actual

5    malice.  On the current record the Court could dismiss against

6    all the sellers on that basis.  Moreover, if the Court were to

7    determine that the statements were not subject to liable claims

8    on the merits, then, of course, that would also moot the issues

9    of immunity and the Court could dismiss on that ground.

10    THE COURT:  Very good.

11    MR SEGAL:  Thank you very much.

12    THE COURT:  Thank you, sir.  Who will speak next?

13    MS. STEINMAN:  Good morning, your Honor.

14    THE COURT:  Good morning.

15    MS. STEINMAN:  I was going to briefly speak about

16    Section 230 and then move onto actual malice, but if you are

17    more interested in hearing about actual malice --

18    THE COURT:  I think you should focus on that.

19    MS. STEINMAN:  On actual malice?

20    THE COURT:  Yes.

21    MS. STEINMAN:  Perfect.  The complaint against Barnes &

22    Noble is not for solely distribution of the book.  It is for

23    distribution of the book and the posting of copy on the

24    internet, and under Section 230 no claim can stand that's based

25    on distribution of the copy on the internet.

1          I believe it would be futile in this case to grant the

2     Plaintiff the right to amend the complaint to plead a mere

3     distribution claim.  It is very clear in this case that Mr.

4     Parisi is  a public figure.  He has basically conceded for

5     purposes of this Motion that he is a public figure; and under

6     Times versus Sullivan in the case of a public figure, the actual

7     malice standard governs.  It is as this Circuit has said a

8     daunting standard and it is even more elevated here because we

9     have book distributors.

10          As Amazon's counsel explained, we may only distribute

11     10 million books, but clearly there has to be a very, very high

12     level of awareness of actual falsity on  behalf of a book seller

13     in order to impose any liability.

14          The complaint here has the most bare boned allegation

15     of actual malice possible.  It just recites the standards.

16     There are absolutely no particulars.  The Plaintiff has

17     submitted evidence which I would respectfully call garbage

18     evidence.  It is literally reams of postings on the internet

19     often from people with no names, you know, multiple levels of

20     hearsay, sheer speculation; and none of it at all establishes

21     anything related to the standard.  And the standard here is that

22     there must be some indication that there is going to be clear

23     and convincing evidence that a high level employee at the

24     booksellers acted with knowledge that the allegedly defamatory

25     statements regarding Dan Parisi and Whitehouse.com were false or

1    had a high degree of awareness of their actual falsity at the

2    time of initial distribution of the book.

3            None of the evidence at all relates to the statement

4    regarding Parisi or Whitehouse.com.  There is no nexus between

5    what was allegedly told to the booksellers and the statements

6    regarding Parisi and Whitehouse.com.  Even if you thought it was

7    admissible that Sinclair called Barnes & Noble to complain about

8    the fact that fake reader reviews had been posted or even if you

9    found it was admissible that he called a Peachtree, Georgia

10   employee to say he heard a rumor that the book was not going to

11   be sold or even if you looked at the postings that readers put

12   up, none of those pertain to the allegations in this case

13   regarding Parisi and Whitehouse.com and whether he was an

14   pornographer or whether he had rigged the polygraph.

15           It is all vague evidence about the character or general

16   content of the book.  As the D.C. Circuit said in Washington

17   Post versus Keogh quote:  "The character and content of the

18   publication is a Constitutionally impermissible evidentiary

19   basis for a finding of actual malice with respect to the

20   particular statements at issue."  It can't just be some general

21   attack on the author's voracity.  It has to be -- there has to

22   be evidence that the publishers or the distributors had

23   knowledge of falsity of the specific statements at issue, and we

24   have nothing like that in the record, your Honor.

25           I would also like to clarify that there is nothing in

1   the record that suggests that Barnes & Noble read this book.  It

2   does have 10 million books for sale.  The Plaintiff has tried to

3   mislead the Court by suggesting that Barnes & Noble must have

4   read this book because the Plaintiff's counsel bought it in the

5   bookstore.  Anybody can walk into a bookstore and order a book

6   that's on barnesandnoble.com from the clerk and it will come in

7   in a few days later and you can pick it up from the bookstore

8   and you get a receipt, but that does not mean that this book was

9   stocked in the bookstores and that it went through the process

10  for books that are being stocked in the bookstores which might

11  in fact be read or partially read by someone at Barnes & Noble.

12          All the evidence shows that this book was not stocked

13  in the bookstores, and there is no indication that anyone at

14  Barnes & Noble read this book and no indication that anybody at

15  Barnes & Noble had any idea that these specific statements were

16  accurate.

17          I would also like to clarify the timing of when you

18  determine actual malice.  There are reams and reams of cases

19  with respect to authors and publishers that establish that you

20  look at the state of mind of the publisher and the author at the

21  time of initial publication of the book.  There are not a lot of

22  cases that discuss this with respect to booksellers, but I would

23  respectfully submit, your Honor, that the same principle should

24  apply and you should look at the state of mind of the bookseller

25  at the time of initial distribution of the book.

1          Otherwise, Barnes & Noble and Amazon would have this

2     impossible burden that every time somebody called their customer

3     complaint hotline or posted a reader review that said this book

4     is incorrect, they would have a massive obligation to undertake

5     huge, timely and expensive research and they can't do that, your

6     Honor. Again, the D.C. Circuit was quite prescient in Washington

7     Post versus Keogh in 1966 when it said quote:  "Verification is

8     a costly process and the newspaper business is one in which

9     economic survival has become a major problem made increasingly

10    grave by the implications of this fact for free debate.  We

11    should hesitant to impose responsibilities upon newspapers which

12    can be met only through costly procedures or through

13    self-censorship designed to avoid the risks of publishing

14    controversial material."  The same, of course, can be said of

15    booksellers.

16          It is necessary to put this case in perspective.  No

17    Court has ever held a bookseller liable for the mere

18    distribution of a book.  In light of the First Amendment

19    concerns at stake, authors and publishers are the ones in our

20    society that take the responsibility for ensuring that the books

21    are accurate.  We don't want booksellers to act as sensors.  We

22    don't want to put them in the role of having to research and

23    assess whether the latest book by Michael Moore or Ann Coulter

24    or Glen Beck is accurate.

25          Those are all controversial books.  We should be

1   distributing controversial books, and we can't take on the role

2   of trying to determine which ones are accurate or not.  Barnes &

3   Noble like the other booksellers is a huge operation with a huge

4   staff, and the fact that someone might have called some low

5   level employee on the customer service hotline can't be enough

6   to put booksellers through the very expensive and costly

7   process --

8           THE COURT:  Are you relying upon publishers to figure

9   this all out before they even get into distribution business?

10          MS. STEINMAN:  Pardon me.

11          THE COURT:  Wouldn't the booksellers actually be

12   relying on the publishers to have figured this all out before

13   they start distributing?

14          MS. STEINMAN:  Exactly.  That's what we do.  We rely on

15   publishers to stand behind their books. They have their  name on

16   the book and in our society they are legally responsible for

17   what's in the book, and that's where the redress is.  It is not

18   to come against the booksellers.

19          THE COURT:  Very good.

20          MS. STEINMAN:  Do you have any questions further?

21          THE COURT:  That's fine.

22          MS. STEINMAN:  Thank you, your Honor.

23          THE COURT:  Thank you.  Mr. Kalish.

24          MR. KALISH:  Your Honor, I am Ralph Kalish for

25   Books-A-Million.  We are in a little different situation than

1    Amazon and Barnes & Noble.  We filed a Motion To Dismiss, not a

2    Motion for Summary Judgment so I would like to start on that

3    point if I could.

4         Books-A-Million's Motion To Dismiss is proper under the

5    Communications Decency Act, and there is nothing to the

6    contrary.  CDA immunity is an appropriate basis for Rule

7    12(B)(6) dismissal and the case that Mr. Segal mentioned Nemet

8    versus Chevrolet controls on this issue, and it is not been

9    challenged by Plaintiffs in any of the briefing.

10        The cases that Plaintiffs submit either are

11   inapplicable or they actually support the position we are

12   taking.  They mention Gomez, a 1980 Supreme Court case, but that

13   predates the CDA by 16 years and isn't terribly instructive.

14   The Goodman case from the Fourth Circuit in 2007 establishes

15   there were facts sufficient to rule on an affirmative defense

16   are alleged in the complaint, then the defense may be reached by

17   a Motion To Dismiss under Rule 12(B)(6) if all the facts

18   necessary to the affirmative defenses clearly appear on the face

19   of the complaint.  That's been the position of Books-A-Million

20   in this case from the get-go.

21        One other procedural point on this -- I will come back.

22   Another case cited by the Plaintiffs, the Donato case, a New

23   Jersey Appellate Court case in 2005, there the webmaster was

24   held liable for messages that it added, but not for those of the

25   third party.  Again, there has been no allegation by the

1    Plaintiffs here that Books-A-Million contributed one wit to

2    either the book or the promotional material.  We didn't alter

3    it, change it or amendment it, et cetera. And that Court in the

4    Donato case held that CDA shielded Donato for posts written by a

5    third party.

6         The Fair Housing case cited by the Plaintiffs also is

7    not applicable. It is there that CDA was not available because

8    the Defendants manipulated it.  They cauterized it and they

9    channeled it to compatible profiles, not because it encouraged

10   it or profited by it.  We -- not applicable to  Books-A-Million

11   at all.  There is only one case that Plaintiffs cite that even

12   comes close to it and really not very persuasive and that's the

13   Universal case from the Southern District of New York from 2007.

14        It is the only jurisdiction that held CDA immunity

15   inapplicable to state IP claims.  But we are not really talking

16   about state IP claims here.  We are talking about Federal

17   claims.

18        There is no basis to allow the states to gut the CDA

19   and have 51 jurisdictions determine where it applies and where

20   it doesn't.  That would clearly undermine the whole

21   Congressional intent of the CDA.  And the Perfect  Ten case from

22   Ninth Circuit in 2007 distinguishes Universal and says that

23   permitting the reach of any particular state's definition of

24   intellectual property to dictate the contours of the Federal

25   immunity would be contrary to Congress' expressed goal of

1    insulating the development of the internet from the various

2    state law regimes.   In that case also neither party raised the

3    question of whether state law counts for IP -- so they really

4    didn't get to that issue.

5          By the same token, Novak held that the complaint

6    established CDA immunity for granting 12(B)(6) dismissal,

7    another case cited by the Plaintiffs.   Sovato case is not

8    applicable because Books-a-Million does not contest that it is

9    not an interactive computer service.   We freely admit that.

10   That's one of the key points that Mr. Segal raised under the

11   three-factor test under CDA.   Hill and Doctor Associate cases

12   also are not applicable because they decline to dismiss --

13   questions concerning the source of the third party material.

14   There is no question of the source here.   It is before the Court

15   in a co-pending case.   There is no allegation again that

16   Books-A-Million participated in the creation of the material.

17          So --

18          THE COURT:   Do you join the other two arguments

19   completely?

20          MR. KALISH:   Yes.

21          THE COURT:   But you still believe a Motion To Dismiss

22   is the best approach procedurally for your client?

23          MR. KALISH:   Yes, we do, your Honor.

24          THE COURT:   Very good.   We will take a brief recess,

25   come back and hear the Plaintiff's argument.

1          (Recess.)

2          THE COURT:  All right, counsel.  I will hear from the

3    Plaintiff.

4          MR. OPARIL:  Thank you, your Honor.  Let me address two

5    issues, actual malice and the Communications Decency Act.

6          Part of this I think overlaps the two; but, first of

7    all, there is -- somebody suggested that the distributorship

8    claim was not in the complaint.  The complaint clearly alleges

9    distributorship liability.  That is their number one.

10          With respect to Amazon's comment in your Honor's

11   question, the CDA was the only issue that Amazon raised in its

12   Motion, and specifically it stated in its reply brief that it

13   was not relying on any notice arguments.  So those were not

14   before the Court.

15          I think it is important for your Honor to understand

16   that this was a book that was originally sold in July -- I

17   sorry -- June of 2009.  In May of 2010, my clients put the

18   Defendants here, the bookseller Defendants on notice of

19   defamation.  They then sued.  At least Barnes & Noble and Amazon

20   continued to sell the book for at least for a period of time.

21          Interestingly enough Amazon continues to sell the book

22   today, not only in its electronic Kindle edition, but also in

23   hard cover.  You can actually go and look and put in an order

24   for the book and it will be shipped to you.

25          Also on the actual malice issue, this was not a case in

1   which we are relying solely on low level or department

2   employees, department store employees who received some kind of

3   communication and, yes, we have put in a series of materials

4   that we have been able to find.  We have not had the opportunity

5   for any discovery from any of these Defendants or any third

6   parties.

7           So, your Honor, we can only get what we can get.  We

8   believe that that provides the basis for Rule 56, either a

9   continuance or dismissal; and until we have at least some

10  discovery on that issue, the case should go forward.

11          In addition, there was notice at high levels.  We

12  contacted by letter the General Counsel of the booksellers.

13  They were made aware of the allegations that the book was

14  defamatory as to the Plaintiffs.  They were then sued and made

15  aware of it and Barnes & Noble at least for a time and Amazon to

16  today nevertheless have continued to sell the book knowing that

17  there is defamatory conduct.

18          THE COURT:  So it is your position that once notice is

19  given that a book could be legally defamatory, they have to

20  cease and desist from selling the book?  Is that your position?

21  Has any Court ever taken that position in this Circuit or any

22  other Circuit?

23          MR. OPARIL:  Your Honor, the Courts have clearly laid

24  out that distributorship liability is available where a

25  bookseller, distributor, vendor has notice, has knowledge that a

1    book has defamatory conduct and continues to sell the book.

2    That's clearly the case here.  They have continued to sell the

3    book.

4           THE COURT:  After it has been adjudicated, it is

5    defamatory or is that when someone just accuses it of being

6    defamatory?  An easier case obviously easily if a book has been

7    found to be defamatory by a Court of law but --

8           MR. OPARIL:  Certainly.

9           THE COURT:  -- but someone calls up one of these book

10   distributors on behalf of their client and says, hey, we think

11   this book is defamatory, are they supposed to cease and desist

12   from selling it? That's your position?

13          MR. OPARIL:  Your Honor, it depends on --  I think it

14   is a factual question that depends on the extent of their

15   knowledge, what they did in response.

16          THE COURT:  Let's talk about facts.  What facts are

17   there in the complaint as it currently exists that shows that

18   they had any knowledge that it was defamatory?

19          MR. OPARIL:  Your Honor, this book was at the time

20   notorious.  There was, as we put in the exhibits and I believe

21   we have alleged in the complaint,  this book was the subject of

22   public discussion.  Mr. Sinclair has put into one of his Motion

23   responses a series of articles from a tabloid in which this is

24   prominently discussed, and plus then once you get to the state

25   of having actual knowledge and continuing to sell the book, I

1    think that that is a real issue for them.

2         In addition, one of the exhibits that we have is a

3    letter from B & N's counsel which says Sinclair's allegations

4    and the interactions between Parisi, Whitehouse.com and Sinclair

5    were also widely publicized.  That's Exhibit Q to the -- to our

6    Opposition to Barnes & Noble's Motion for Summary Judgment.

7         So I think your Honor has enough facts where even if it

8    is not, there are inadequate facts alleged in the complaint, we

9    would be capable of filing an Amended Complaint and would

10   request the opportunity to do so.  We would also request the

11   opportunity and your Honor, as someone noted stayed the case, we

12   would request the opportunity to supplement the complaint with

13   things that have happened since the complaint was filed in May

14   of 2010.

15        With respect to -- before I move onto CDA, let me make

16   a couple other points for your Honor.  Smith versus California,

17   a Supreme Court case which we have cited in our Barnes & Noble

18   opposition says that circumstances may warrant an inference that

19   a distributor is aware of what the book contained and, again, I

20   think we have pointed out facts that could give rise to that

21   inference.

22        The Lurman case which we also cite denied a Motion for

23   Summary Judgment saying that there are issues of fact as to the

24   distributor's knowledge.

25        THE COURT:  Is your allegation of knowledge here, it is

1    just a function of the notice that was provided to the General

2    Counsel of at least one of these companies?

3              MR. OPARIL:  It is I think two series, your Honor. One

4    is before that when there was publications about the book, when

5    there was to the best of our information some contact between

6    people and Barnes & Noble and --

7              THE COURT:  What people? It is a little vague.

8              MR. OPARIL:  There are third-party citizens.  There are

9    facts regarding Mr. Sinclair's contacts with Barnes & Noble.

10   Mr. Sinclair made statements saying that he was going to ask

11   Barnes & Noble to review the book and put it in the store.

12   Again, having not had the opportunity for factual discovery, we

13   believe that there should be at least some discovery on that

14   issue going forward.

15             THE COURT:  Wouldn't the distributor in a situation of

16   that kind be depending upon the publisher to, so to speak, carry

17   the fight as to whether or not the book is in any way defamatory

18   and just wait and see how that pans out in the legal system?

19             MR. OPARIL:  Well, your Honor, again, not if they had

20   notice and knowledge that the book was defamatory.

21             THE COURT:  No.  They had notice and knowledge that you

22   were accusing of it of being defamatory.

23             MR. OPARIL:  Right.

24             THE COURT:  That's a long way from whether it is in

25   fact defamatory.  In essence, what you want them to do, the

```
 1    distributors  here, is to do some kind of a legal -- go out and
 2    retain a law firm, do some kind of legal analysis as to whether
 3    or not something might be defamatory.
 4            MR. OPARIL:  Your Honor, I don't think you can get -- I
 5    don't think that you can simply say that when you get a serious
 6    indication that a book has defamatory content or may have
 7    defamatory content --
 8            THE COURT:  What made it serious?  The fact that a law
 9    firm was involved?
10            MR. OPARIL:  The fact that a law firm was involved, the
11    fact that it was subject to such extensive public discussion,
12    discrediting the allegations.  I mean all of that you cannot
13    simply sit back ostrich like and say we don't want to know.
14            THE COURT:  But isn't it more a question of whether you
15    can sit back and rely upon the publisher to defend the book that
16    the publisher traditionally is in the best position to assess
17    and evaluate whether or not the book could be potentially --
18    after all, publishers have multiple lawyers at their disposal
19    in-house and outside advisors that they do all the time.  They
20    are constantly doing evaluations of books that they publish to
21    determine whether or not they might be possibly legally
22    defamatory.
23            So the booksellers are relying on them to a large
24    extent to make sure the books that they are going to be
25    ultimately distributing are not in fact defamatory, are they
```

1    not?

2              MR. OPARIL:  Well, your Honor, it depends on the

3    factual circumstances.  If you are dealing with Harper and Row

4    as the publisher --

5              THE COURT:  Okay. Let's take a Simon and Schuster.

6              MR. OPARIL:  In that situation, if you get some notice

7    that a book that's published and has been vetted by Simon and

8    Schuster is not defamatory, you may be able to rely on that; but

9    that's not what happened here.  What happened here was this book

10   was self-published by a company Sinclair Publishing, Inc. that

11   Mr. Sinclair formed and controlled.  There was obviously no

12   phalanx of lawyers who reviewed this book for defamation.

13             THE COURT:  Why wouldn't that put Mr. Sinclair and his

14   company, the publishing company, squarely in the bull's eye?

15             MR. OPARIL:  Oh, it absolutely does, your Honor.  We

16   are not denying that. Absolutely.

17             THE COURT:  All right.

18             MR. OPARIL:  But the question is whether or not the

19   booksellers as distributors of all hard cover tangible book,

20   paperback book may also be in the cross hairs because of what

21   they know or what they knew in their failure to do absolutely

22   anything about it and, in fact, when you have a complaint that

23   details why it is defamatory, the specific basis for the false

24   statements, what false statements there were and you

25   nevertheless continue to sell the book for months and months

1    after that and continue to sell the book, I think that that

2    creates a different posture in this situation than when you are

3    dealing with Simon and Schuster.

4             THE COURT:  Go ahead.

5             MR. OPARIL:  Your Honor, with respect to the CDA, we do

6    have here a case where you are talking about the distribution

7    not just of an electronic version of the book.  Amazon sells it

8    on -- through their Kindle store but Barnes & Noble and

9    Books-A-Million and Amazon have entered into a relationship

10   whereby they obtain the books, they sell the books, they ship

11   the books, they get paid for the books, and then in turn they

12   pay the publisher or the author.

13            There is nothing that indicates that the CDA is

14   intended to apply to those kinds of non internet transactions.

15   I mean free speech and what Congress tried to do in enacting the

16   CDA to encourage the use of the internet and use of speech on

17   the internet doesn't apply here when you are talking about a

18   tangible product.

19            You know, Barnes & Noble you could also order the book

20   by phone.  You didn't have to touch the internet to deal with

21   that.  And the Batsel versus Smith case, which is I think cited

22   by perhaps everybody here, specifically said that the CDA did

23   not apply when distribution is not made or intended to be made

24   on the internet.

25            Well, this book was, putting aside Kindle, this book

1   was not being distributed on the internet.  It was being

2   distributed in paper copies.  The CDA only applies to

3   information provided for use on the internet and Betsel makes

4   that clear.  Blumenthal versus Dodge the CDA applies to material

5   quote "disseminate through the internet."  This book was not

6   disseminated through the internet.  It was disseminated in hard

7   copy.

8           There is also I would point, your Honor, to the Kern

9   versus Amazon case from the District of West Virginia in which a

10  company called Cafe Press sold T-shirts on the internet bearing

11  the image of the Plaintiff.  Cafe Press moved to dismiss on CDA

12  grounds, immunity grounds, and the Motion was denied.  The Court

13  said that for that tangible T-shirt product Cafe Press produced

14  it, it set the price, it took orders, shipped, received payments

15  and obtained profits in the real world, not the cyber world.

16          In the one of the briefs, I believe it is Barnes &

17  Noble, pointed the Court to Gentry versus e-Bay in which there

18  was a tangible good involved, but the difference was that e-Bay

19  was acting as a true internet intermediary.  It never touched

20  the product.  It obtained bids.  Once a winning bid was

21  accepted, the seller of the good then directly shipped the

22  product so there was no contact between e-Bay and the tangible

23  product as the intermediary.

24          THE COURT:  Talk for a minute about  your theory of

25  damages here.

1          MR. OPARIL:  Yes, your Honor.

2          THE COURT:  I am not quite clear in my own mind from

3    looking at your complaint what it is that your theory is as to

4    how even if this was defamatory to your client that it resulted

5    in the kind of damages that you are seeking in this case.  Can

6    you be a little more straightforward about that?

7          I think your big concern is that  there was a lost

8    business opportunity for Whitehouse.com and your theory is if

9    all of this hadn't occurred, then the Whitehouse.com would have

10   been able to be a successful venture and it might have been

11   worth millions and millions of dollars but because of the quote

12   "defamatory effect" of this book, all of a sudden Whitehouse.com

13   couldn't be.  Now, I am trying to understand how that isn't

14   anything but total crystal ball gazing, total speculation, total

15   on your part.  Help me understand how that's something other

16   than just total speculation and crystal ball gazing involved.

17         MR. OPARIL:  Certainly, your Honor. We addressed this

18   probably most directly in most detail in our opposition to Mr.

19   Sinclair's Motion for Summary Judgment.  But a couple things.

20   One, we have a situation here of liable per se.  I mean the book

21   accuses and we may get into this more with Mr. Sinclair --

22         THE COURT:  He will get a chance to make his argument.

23         MR. OPARIL:  But the book essentially accuses Mr.

24   Parisi, Whitehouse.com of committing crimes.  We talk about the

25   crimes.  So there is a libel per se issue and whether or not

```
 1    there is even a need to prove special damages, but also there
 2    was a situation in which --
 3             THE COURT:  You deny that Parisi is a public figure,
 4    Whitehouse.com is a public entity, right?
 5             MR. OPARIL:  Whitehouse.com is a public entity and for
 6    at least for the purposes of these Motions we are not going to
 7    deny that he is not a limit (sic) public figure.  So your Honor
 8    doesn't need to address that.
 9             THE COURT:  All right.
10             MR. OPARIL:  In terms of damages, you had a website.
11    Whitehouse.com was trying to develop itself into a mainstream
12    political based internet site, legitimate news, commentary, that
13    kind of thing.  When the book came out, it became very difficult
14    to try to do that because the allegations that Mr. Sinclair made
15    were such a distraction that that really became a problem.
16             There is evidence that there were efforts made, a
17    number of efforts made to try to sell the site to others and the
18    evidence and Mr. Parisi puts in the declaration in this with the
19    Sinclair opposition, he was specifically asked by potential
20    buyers about the Sinclair allegations.  He was told by potential
21    buyers that they didn't want to touch it because of the Sinclair
22    issues.
23             They also attempted at the time to develop essentially
24    an internet based TV network that would be tied to
25    Whitehouse.com.  There was an extensive business plan that was
```

1    prepared in June of 2009 coincidentally the same month as the

2    book came out.  Efforts were made to develop that.  My client

3    spent approximately $250,000 to try to develop that idea to

4    obtain on air talent, and it became a problem to recruit people,

5    to get investigators, to get working capital because the

6    allegations that Mr. Sinclair made were still hanging over the

7    Whitehouse.com name.

8           THE COURT:  Which allegations do you focus on here?

9           MR. OPARIL:  The allegations we are focusing on are the

10   allegations --

11          THE COURT:  Not the ones about the President?

12          MR. OPARIL:  No.

13          THE COURT:  No.

14          MR. OPARIL:  They are not at issue here, your Honor.

15          THE COURT:  What are the allegations you are focusing

16   on?

17          MR. OPARIL:  The allegations that we are focusing on

18   are related to the notion that Mr. Sinclair and Whitehouse.com

19   offered this polygraph examination to Mr. Sinclair back in

20   February of 2008.

21          THE COURT:  Wait a minute.  Did you mean Mr. Parisi?

22   You just said Mr. Sinclair offered it to --

23          MR. OPARIL:  No.  Whitehouse.com offered it to Mr.

24   Sinclair.

25          THE COURT:  Okay.

```
 1              MR. OPARIL:  And then Mr. Sinclair --
 2              THE COURT:  To take a polygraph?
 3              MR. OPARIL:  Right.  And the polygraph was
 4    administered.  There is a whole series of e-mail agreements back
 5    and forth.  Mr. Sinclair's examination report indicated
 6    deception on the key questions.  Mr. Sinclair then alleged and
 7    alleged in greater detail in the book that --
 8              THE COURT:  Let me ask you to pause there a second.  So
 9    so far we are talking about an allegation that Mr. Sinclair has
10    made that Mr. Parisi and Whitehouse.com wanted him to have a lie
11    detector test, right?
12              MR. OPARIL:  Correct.
13              THE COURT:  Which he claims he failed, right?
14              MR. OPARIL:  Who claims he failed?
15              THE COURT:  Mr. Sinclair is claiming that he failed the
16    lie detector test.
17              MR. OPARIL:  No.  Mr. Sinclair is saying that the lie
18    detector test which Mr. Parisi and Whitehouse.com arranged for
19    was not rigged.
20              THE COURT:  Was rigged.
21              MR. OPARIL:  And it was rigged because there was an
22    agreement between Whitehouse.com and Mr. Axelrod who was
23    President -- then Senator Obama's campaign person.  There was an
24    arrangement whereby Axelrod agreed to pay Whitehouse.com or Mr.
25    Parisi $750,000 to arrange for and administer this rigged
```

```
 1   polygraph exam.  That's the allegation that we are focusing on.
 2            THE COURT:  Do you have a basis to believe that anyone
 3   believed this?
 4            MR. OPARIL:  Oh, well, your Honor, again I don't want
 5   to go back to internet postings, but there is all kinds of
 6   allegations that people believe this.
 7            THE COURT:  Yes, but if you are going to succeed in a
 8   defamation case, you have to succeed in front of the jurors in a
 9   courtroom.
10            MR. OPARIL:  Absolutely, your Honor.
11            THE COURT:  How would you ever demonstrate, how would
12   you ever be able to demonstrate that this was something that was
13   believed by anybody anywhere?
14            MR. OPARIL:  Your Honor, there is a number of different
15   evidentiary sources.  I mean one is --
16            THE COURT:  You mean not posters on the internet?
17            MR. OPARIL:  No.  No.  No.  We will have testimony.  I
18   mean we will have testimony.
19            THE COURT:  So you are bringing in witnesses who would
20   say, hey, I read that I believed it?
21            MR. OPARIL:  Absolutely. There is also --
22            THE COURT:  As a result of it, the stock or the value,
23   I should, say of Whitehouse.com was reduced?
24            MR. OPARIL:  Certainly, your Honor, but believe it or
25   not, there is a lot of stuff out there.  I mean in some of the
```

1    radio interviews that Mr. Sinclair conducted after the book was

2    published, believe it or not, they were treated seriously and

3    they were believed.  Some of them are in the record here with

4    our opposition, audio recordings of those interviews.  There

5    will also be people who will testify that they heard these

6    allegations and didn't know if they were true or not.  There

7    will be others that we will be able to bring in who believed

8    that Mr. Sinclair was telling the truth in his book, outrageous

9    as those allegations may be.

10         THE COURT:  But more relatively, you would be prepared

11   to introduce evidence that people who are on the verge of making

12   deals to spend $20 million, $30 million I think is your

13   allegation for the Whitehouse.com all of a sudden changed their

14   mind because they heard about these allegations? You have people

15   who would say that under oath?

16         MR. OPARIL:  I don't think at the moment we would have

17   anybody who would say they were prepared to spend $20 million or

18   $30 million.

19         THE COURT:  How about $1 million? Do you have anyone

20   who  would say we would have spent a million dollars to buy

21   Whitehouse.com but we heard about these allegations that

22   Sinclair made regarding Parisi and as a result we got scared

23   off? Do you have someone who would say that?

24         MR. OPARIL:  Your Honor, to be absolutely candid with

25   the Court, I don't know how much money we would have a third

1   party being able to come in and say that they were prepared to

2   invest.  That is not an issue --

3          THE COURT:  You are seeking $30 million in damages in

4   this case, right?

5          MR. OPARIL:  Yes, your Honor, because that -- my client

6   believes that at the end of the day had he been successful, the

7   site would have been worth that, and that's based on amounts

8   that some other successful political sites have sold for

9   recently.  I think that may be a little crazy, but that's what

10  the market will bear.

11         THE COURT:  This isn't exactly Facebook we are talking

12  about here.

13         MR. OPARIL:  Well, your Honor, we don't know because we

14  never got that far.

15         THE COURT:  You are not going to make that argument.

16  Go ahead.

17         MR. OPARIL:  I am -- who would think Facebook was worth

18  as much as it is, your Honor?

19         THE COURT:  Well, Winklevoss didn't realize it.

20         MR. OPARIL:  Your Honor, unless you have any questions,

21  I think that's all I need to raise.  I think I have used up my

22  time.

23         THE COURT:  That's fine. You have.  Each of the

24  Defendants are entitled to 5-minute rebuttal.

25         MR. OPARIL:  Thank you, your Honor.

1          THE COURT:  Mr. Segal, do you want to go first?

2          MR SEGAL:  Thank you, your Honor.  I will try to be

3   quick here but I beg the --

4          THE COURT:  You want to be succinct, not quick.  If you

5   are too quick, Patty can't take it down.  So speak succinctly

6   but not fast.

7          MR SEGAL:  Thank you, your Honor.  I will attempt to do

8   so.

9          THE COURT:  Good.

10         MR SEGAL:  And I beg the Court's indulgence in

11   referring to a few cases that I think are particularly pertinent

12   in light of the Plaintiff's arguments.

13         THE COURT:  Okay.

14         MR. SEGAL: One of those is the Zarin decision from the

15   Fourth Circuit which is a seminal CDA case.  It talks about the

16   exact notice issue that your Honor raised in dialogue with the

17   Plaintiff.  It said:  In rejecting the idea of notice liability

18   after the fact that notice based liability for interactive

19   computer service provides would provide third parties with a no

20   cost means to create the basis for future lawsuits.  Whether one

21   was displeased with the speech of another party conducted over

22   an interactive computer service, the offending party can quote

23   "notify the relevant service provider claiming the information

24   to be legally defamatory."

25         Again the Fourth Circuit went on and rejected that as a

1    basis for imposing liability.  We think that's good precedent

2    for the Court to follow here.  Again, Fourth Circuit, seminal

3    decision under the CDA.

4            THE COURT:  I am usually more convinced by the Fourth

5    than the Ninth.  I think the Supreme Court is too, but go ahead.

6            MR SEGAL:  Yes, I can appreciate that. Certainly on the

7    numbers, that would be  case, your Honor.  Let me refer then

8    also to the D.C. Circuit's decision --

9            THE COURT:  I like those.  That's priority one.

10           MR SEGAL:  An even better one. Yes, thank you.  The Bud

11   McFarlane versus Sheridan Square decision which is cited in

12   Barnes & Noble's briefing, and that case related to a book that

13   was published called Profits of War which theorized that the

14   Iranian hostage crisis in 1980 was a conspiracy by the

15   Republican Party to elect Ronald Reagan and get Jimmy Carter out

16   of office.

17           THE COURT:  That's one I know a little bit about.

18           MR SEGAL:  Yes. And that book, your Honor, was several

19   months after its publication thoroughly debunked and discredited

20   by not a mere allegation of liability, but a Congressional task

21   force that investigated all the allegations thoroughly.

22           THE COURT:  That I was the Deputy counsel to.

23           MR SEGAL:  So you are familiar with this, your Honor?

24           THE COURT:  Yes.  Yes.

25           MR SEGAL:  Perhaps I don't need to go into additional

1    detail then about the facts but simply to say that in the

2    defamation case that was brought against the publisher and the

3    distributor and the author of that book, the D.C. Circuit

4    concluded that there was no basis or requirement that that book

5    retracted even after the completed Congressional investigation

6    and to quote here from the decision, it says:  "McFarlane

7    presents no authority nor are we aware of any for the

8    proposition that a publisher may be liable for defamation

9    because it fails to retract a statement upon which grave doubt

10   is cast after publication."

11          That I think is the key here.  It is also the key to

12   the actual malice issue.  Mr. Oparil said, well, we didn't move

13   on the notice issue; and that's accurate, your Honor. However,

14   the actual malice issue would moot the notice issue because if

15   the only allegation is that post publication or post

16   distribution events created the basis for liability and in fact

17   those post publication events are based upon your allegations in

18   a cease and desist letter, then the Court's ruling on that would

19   prohibit claims from going forward as to any of the sellers.

20          THE COURT:  There is nothing in the complaint that show

21   pre-notice or knowledge.

22          MR SEGAL:  Absolutely, that's correct.  There is no

23   evidence of that, your Honor. We wouldn't expect any to be found

24   and so let me also briefly address the Kurren decision because

25   that was cited by the Plaintiffs.  It is a District Court case

1    and in that case it is true that the District Court denied a

2    12(b)(6) Motion brought by Cafe Press but the issue there was

3    that Cafe Press had not even established whether it was an

4    interactive computer service or not.  We didn't get into a

5    determination of whether or not because they were selling

6    T-shirts the CDA did not apply.

7         So the ruling of the Court again was simply that on a

8    12(b)(6) Motion they could not make a determination as to

9    whether Cafe Press satisfied all the elements required for

10   immunity under the CDA so the case went forward.

11        And I would refer to the characterization of the

12   transactions that do give rise to immunity by Plaintiff's

13   counsel, dissemination through the internet.  In our case for

14   Amazon.com every transaction was a dissemination through the

15   internet.  The Kindle store, that's completely online.  All the

16   purchases are online.

17        Yes, it is true that the end product at times was in

18   hard copy, but that's what happened in Gentry.  It was sports

19   memorabilia, baseballs, autographed baseball cards and the like

20   and the allegations against e-Bay were that they were violating

21   the sports memorabilia code in California, and that was an end

22   product that was ultimately sold offline but all the

23   transactions occurred online.

24        The Batzel decision isn't any contrary authority for

25   that.  That is a Ninth Circuit decision, your Honor, but in that

1   case the question was whether the material was intended for --

2           THE COURT:  Sometimes they are right.

3           MR SEGAL:  Yes. Well, and I think that that's decision

4   is fine as far as it goes, but where it goes is to say that if

5   you send somebody something that's not intended for publication

6   at all, and in that case it was notification by a tradesperson

7   that said you know I have been working at this other person's

8   house, I think this person is the granddaughter of Heinrich

9   Himmler and I think that she has got looted art collection from

10  the Nazis that was acquired during World War II and the

11  tradesperson sent an e-mail to the Museum Security Association

12  in Europe asking that this be investigated.

13          The Museum Security Association posted that e-mail

14  online and there was an open question of fact as to whether that

15  had ever been intended for publication or whether it was simply,

16  you know, an anonymous tip; and the Ninth Circuit therefore

17  remanded the case to decide whether or not it was ever intended

18  for dissemination through the internet at all.

19          THE COURT:  Right.

20          MR SEGAL:  We agree that in that circumstance -- I mean

21  if Mr. Sinclair had sent unsolicited e-mails and we had

22  voluntarily at our own direction posted them online, that's a

23  different story if they were never intended for publication.

24  The policy reason why that's a different story is that Mr.

25  Sinclair might not be liable in that situation because there was

1    no intent to publish.  And so the Ninth Circuit was very

2    concerned about making sure there was a liable party. Here that

3    is not an issue. There is no a dispute that this was material

4    that was intended to be published.

5          So unless the Court has any other questions --

6          THE COURT:  No, that's fine.

7          MR SEGAL:  Thank you very much, your Honor.

8          THE COURT:  All right.  Thank you, Mr. Segal.  Ms.

9    Steinman.

10          MS. STEINMAN:  A couple of points.  One, your Honor, if

11   you look at the record, you will see that there is no evidence

12   that a high level employee at Barnes & Noble had awareness that

13   there was anything specifically false about these particular

14   statements.

15          Let's talk for a second, it is true that Mr. Oparil in

16   attempt to get some money from all of us sent us a draft of the

17   complaint and he didn't send us any evidence.  He just sent us a

18   draft of the complaint and that was sent to the General Counsel

19   of Barnes & Noble.  The book was removed a month later.

20          You are absolutely right, your Honor, as  you suggest

21   booksellers can't pull down books the moment they get a letter

22   from somebody.  We would have no books if we did.  That way we

23   have to wait for a Court to reach an adjudication.

24          THE COURT:  And that could take years.

25          MS. STEINMAN:  And that could take years.  I think this

1    case is a perfect example, your Honor. You have been deluged

2    with evidence and the process of determining what is accurate

3    about this book and what is inaccurate is time consuming task.

4              THE COURT:  Yes.

5              MS. STEINMAN:  And not one that the booksellers can do

6    for their 10 million or 30 million books.  Just to add to the

7    list of cases that establish that you look at actual malice at

8    the time of publication, it is both McFarlane versus Sheridan

9    Square Press 91 F.3d 1501 D.C. Circuit 1996.  Also the Secord

10   case at 747 F. Supp. 792 saying quote:  "It is hornbook liable

11   law that post publication events have no impact whatsoever on

12   actual malice as it bears on this lawsuit since the existence or

13   nonexistence of such malice must be determined as of the date of

14   publication."

15             Herbert versus Landau a Second Circuit decision 781

16   F.2nd 298 and the Lorenz case, 223 F. Supp. Second at 56 also

17   says quote:  "There is no duty to retract or correct a

18   publication even where grave doubt is cast upon the voracity of

19   the publication after it has been released."

20             Those are all cases regarding publishers or authors but

21   again the same principle that underlie those cases should apply

22   here to distributors in light of the same First Amendment

23   concerns.

24             THE COURT:  Okay.

25             MS. STEINMAN:  Under the CDA, your Honor, again to just

1    clarify our principal argument is that there is no liability

2    based on the brief sentence posted on the internet under the

3    CDA.  That really is the thrust of the claim against Barnes &

4    Noble here that it engaged in quote "more than mere

5    distribution" because of that copy and the CDA clearly bars that

6    claim.  The copy was not written -- was clearly written by

7    Sinclair and not by Barnes & Noble and Sixth Circuit Courts have

8    made very clear that the test is did you contribute materially

9    to the unlawfulness of the material.

10          Clearly Barnes & Noble did not contribute materially to

11    the allegedly defamatory content here.  It played no role

12    whatsoever with regard to the allegedly defamatory one sentence

13    that was posted under the -- from the publisher headline on its

14    website.

15          Finally, with respect to damages, your Honor, I can't

16    resist.  I think that it is likely that the reason that they had

17    difficulty signing the Whitehouse.com domain name was that for

18    decades that had been a notorious porn site, and I would imagine

19    that that far more than any book was the cause of some of the

20    difficulties in selling the website.  The evidence before the

21    Court on that would also allow the Court to get rid of that

22    allegation on grounds of truth.  Thank you.

23          THE COURT:  Very good.  Mr. Kalish.

24          MR. KALISH:  I don't have much to add, your Honor; but

25    I just want to stress that there is really -- the Plaintiffs

1    allege only that Books-A-Million offered the Sinclair book for

2    sale and that's their total claim.  There is no notice in there

3    that we knew any high level person knew, even a low level person

4    knew anything about the content of the book or the defamation.

5    With all the filings in this case, the Plaintiffs have not cited

6    one case holding to that point.

7            The Kansas case they did submit was about a

8    self-publisher.  That's not applicable to Books-A-Million.  They

9    don't publish.  So the only other point I would like to make is

10   that, and we didn't really touch on it, is the count 5, the

11   civil conspiracy thing is another overreach by the Plaintiffs;

12   and the notion that Barnes & Noble and Books-A-Million and

13   Amazon are all conspiring against Parisi, it is just a flight of

14   fancy.  We are  24/7 competitors, and he just doesn't get on the

15   radar screen.

16           And on the damages issue, if Plaintiff were to succeed

17   on that, then I think I will sue the St. Louis Cardinals and

18   tell them they owe me $30 million a year because they should

19   have hired me.  So thank you, your Honor.

20           THE COURT:  All right.  Mr. Sinclair, you have your own

21   Motion.  Would you like to come up and address the Court for a

22   few minutes on that, although I have already touched on some of

23   the -- maybe the issue that you were focusing on there, but it

24   seems to me you have been sitting patiently so you are entitled

25   to at least a few minutes.

1          MR. SINCLAIR:  Thank you, Judge.  Actually I am a

2     little confused now because I listened to Mr. Oparil's rebuttal

3     to the booksellers, and he is discussing the alleged allegations

4     by Mr. Parisi against me and my book; and he states, you know,

5     he goes on to say that these statements are defamatory.  He

6     makes statements of fact that these have been discredited and

7     they haven't been.

8          Let me first start out by saying, your Honor, my Motion

9     is primarily a Motion To Dismiss for failure to state a claim

10    and which they are even entitled to be granted relief.  Mr.

11    Parisi and Mr. Oparil or Plaintiffs have attempted to oppose the

12    Motion more as a Motion for Summary Judgment because it is a

13    little easier for them legally.  There is nothing in the

14    complaint whatsoever that makes a factual statement or

15    allegation that anything that they are alleging is defamatory.

16         In the Motion To Dismiss for failure to state a claim,

17    I have addressed every single paragraph of the Plaintiff's

18    complaint with documented fact, e-mails from Plaintiff Parisi,

19    written published articles from Whitehouse.com dated and time

20    stamped by Mr. Parisi with corresponding e-mails to demonstrate

21    a pattern of false publications on its website for the purpose

22    of publicity.  Okay.

23         Now, I have heard Mr. -- Plaintiffs' counsel talk about

24    the fact that, you know, Whitehouse.com has been severely

25    damaged by me.  I think the thrust of their complaint in the

1    opposition says that, let's see, two categories of statements

2    that they feel defame them.  The first one being Dan Parisi as

3    an internet porn merchant and/or pornographer.

4            Plaintiffs cannot deny under any circumstances that Dan

5    Parisi and Whitehouse.com are internationally notorious for

6    internet porn.  Regardless of whether they claim that he ceased

7    in 2005 or not, he is still known for that.

8            There is declarations filed before this Court stating

9    that Mr. Parisi, White House Communications, or Whitehouse.com

10   have not engaged in internet pornography or contained adult

11   content on their website since at least April of 2005  if  I

12   remember correctly.

13           I want to apologize for having to bring this to the

14   Court today.  This came to my -- I became aware of this this

15   past Wednesday.  I refused to attempt to file it through the

16   electronic filing system because I don't want the material on

17   Pacer.  Your Honor, as of this very moment Dan Parisi, White

18   House Communications, Inc. and WhiteHousesex.com is still

19   operating as an internet porn site, and the administrator to

20   this site is one Daniel Parisi, the same address that's on file

21   here in the Court's complaint.

22           So me alleging that Dan Parisi is an internet porn

23   merchant, here is evidence that he is still making money

24   distributing, offering, circulating and selling internet porn. I

25   brought one for the Court and one for the Plaintiff.

1          THE COURT:  Why don't you do this.  Why don't you hold

2    onto that until such time as the Court needs it.

3          MR. SINCLAIR:  Okay.

4          THE COURT:  The Court might not need it.  So you just

5    hold onto it.

6          MR. SINCLAIR:  All right.  I have addressed every

7    single allegation.  Now, the Plaintiffs want to say that I

8    somehow defamed them by accusing Dan Parisi of taking a bribe.

9    If you look at my Motion To Dismiss, if you look at the

10   paragraphs that Plaintiffs have put in their complaint, it

11   clearly states that I received information.  I even identified

12   the phone numbers of the individual rather than the individual's

13   name.  Okay.

14          I have repeatedly stated that it has been my conclusion

15   that I believe this information was not solely based on one

16   informant.  The information, my conclusion was based on the fact

17   that, one, the agreement between Parisi and Whitehouse.com and

18   myself regarding the polygraph was never complied with.

19   Plaintiffs have not disputed that in their opposition to the

20   Motion To Dismiss.

21          What they attempt to do is say that, well, yes, we

22   published false articles, but it is because Sinclair requested

23   it.  You know, that's not going to fly.  He can't justify that.

24          The simple fact of the matter is every statement in my

25   book that the Plaintiffs allege to be untruthful and defamatory

1    are either truthful and/or substantially truthful, and there is

2    evidence and explanation as to how I reached each conclusion.

3    Okay.

4            In Copeland versus Jackson 55 Federal Sup Second at

5    217, if a publication is substantially true, then it is true as

6    a legal matter for defamation purposes.  Now, the title of my

7    book has a question mark at the end of it.  That was put there

8    specifically for people to question certain things.  I still

9    question certain things because there is certain information

10   that when I was writing this book and trying to verify things,

11   let's face it, Mr. Parisi, Plaintiffs was not willing to give up

12   a whole lot.  Ed Gelb refused to even turn over the contract and

13   the full results of the polygraph.  Just a simple two paragraph

14   report.

15           Now Plaintiffs attempt to say that -- what was the

16   quote? Mr. Sinclair was asked three additional questions and

17   they list the questions in their opposition and they make the

18   statement that it is highly unlikely a person of my past could

19   answer those questions honestly, but yet they fail to include

20   their own evidence to determine whether or not I passed them or

21   not.

22           This is something that Dan Parisi has been very good

23   at.  He likes to twist things and put parts out there.  I have

24   addressed this thing in chronological order date and time, not

25   knowingly said anything false about this man.  I have tried to

1   back up everything that's stated in this book.

2          Plaintiffs are definitely limited purpose public

3   figures and as such there is no way that this complaint should

4   proceed any further.  Mr. Parisi if he wants to argue malice, I

5   think the pleadings and papers that have been filed in this

6   Court by Plaintiffs would demonstrate the maliciousness of

7   Plaintiffs towards me as opposed to my desire to be malicious

8   towards them.

9          I mean the opposition to the Motion To Dismiss 274

10  pages and over 100 pages is nothing but personal internet

11  attacks for the Court to allow to be distributed as public

12  record.  There is no basis for this complaint.  They have

13  definitely demonstrated not a single fact in their complaint.

14  They have not alleged a single fact.  I think it was Bell

15  Atlantic versus Twombly where the Court determined that they had

16  to establish at least some fact in the complaint that would

17  demonstrate plausibility for the claims alleged.  Even though

18  that was an antitrust case,  I think it was Ashcroft versus

19  Iqbal where it was generally applied to most civil cases and

20  again it specifically states that in order to survive a Motion

21  To Dismiss for failure to state a claim.

22          The complaint not their opposition Motions, not their

23  footnotes, the complaint has to state at least some facts that

24  would support the plausibility.  Plaintiffs can't do that.

25  Plaintiffs cannot do it.  They are not prepared to put people on

1   trial over this ludicrous claim of defamation that they would

2   have to bring in to try to prove that somehow I knowingly made a

3   false statement about them.  I have not knowingly made false

4   statements.

5        What I did do in an effort to meet the Plaintiffs

6   halfway is once Mr. Oparil notified me of Plaintiff's intent to

7   sue which happened to be the same day the complaint was filed, I

8   did offer to actually edit one section of the book where I would

9   include that Plaintiffs had now denied any connection with the

10  campaign or the polygraph, but that based on the information

11  that I had, I still believe it to be true.

12       THE COURT:  All right.  Thank you very much, sir.

13       MR. SINCLAIR:  I don't think I did a very good job,

14  but --

15       MR. OPARIL:  I will be very brief, your Honor.

16       THE COURT:  That's fine.

17       MR. OPARIL:  If this is primarily a Motion To Dismiss,

18  then we have very little to talk about.  The complaint alleges

19  the defamatory statements, the fact that they are untrue and the

20  actual truth.  Mr. Sinclair obviously is appearing pro se and  a

21  Motion To Dismiss the facts in the complaint must be taken as

22  true, and particularly given the evidentiary information that we

23  have put in including Mr. Parisi's own declaration, there is a

24  factual basis for it.

25       With respect to the issue of whether or not the

1    allegations are true or substantially true, that is a disputed

2    issue of material fact.  As we have seen, Mr. Sinclair indicates

3    that he has put in all kinds of e-mails and things with respect

4    to agreements.  Mr. Sinclair does not, however, put in any

5    factual material as to the basis for his assertion that this

6    polygraph was rigged or even that he received a tip to that

7    effect.  There is nothing like that in the record.

8         With respect to actual malice, it is not animosity is

9    the standard as you know, but it is whether or not you have

10   knowledge that it was false or reckless disregard of whether or

11   not it was false or not.  We cite in our brief the St. Amant

12   case by the Supreme Court which indicated the Defendant in a

13   defamation action cannot automatically ensure a favorable

14   verdict by testifying that he published with the belief that the

15   statements were true.  That's what Mr. Sinclair did today.

16        Perhaps more significantly, the case goes on to

17   specifically say that professions of good faith are unlikely to

18   be persuasive or statements fabricated by the Defendant is the

19   product of his imagination or is based wholly on an unverified

20   anonymous telephone call which is precisely what Mr. Sinclair

21   has argued today.  I have already addressed with your Honor the

22   issue of damages.

23        However, I did remind myself that after the book was

24   published, Mr. Parisi did receive death threats from various

25   people based on the allegations in the book and the belief that

1    they were true.  So I will just throw that out there for your

2    Honor.  Unless you have any questions --

3              THE COURT:  No, that's fine.

4              MR. OPARIL:  Thank you, your Honor.

5              THE COURT:  All right.  I will take it under

6    advisement, counsel, and Mr. Sinclair; and, as I said before,

7    until I have resolved these Motions, I don't want any further

8    pleadings in this case.  There is no reason for that.  I think

9    this needs to be looked at carefully and evaluated and addressed

10   in the first instance, and then we will see where we are at that

11   point.  Okay?

12             Mr. Sinclair, do you have a question?

13             MR. SINCLAIR:  Yes, your Honor. Can I respond very

14   quick?

15             THE COURT:  Come on up.  You want to respond to

16   something he said?

17             MR. SINCLAIR: Just two things real quick.

18             THE COURT: Can you do it in two  minutes?

19             MR. SINCLAIR:  I can do it in less than that.

20             THE COURT:  Perfect.

21             MR. SINCLAIR:  The Plaintiffs state that I based

22   information on an unverifiable phone call and that there is no

23   evidence in the record to indicate that that anonymous phone

24   call was received.  I do believe that in the reply to the

25   opposition that evidence in exhibit of an e-mail verification

 1    from a Pulitzer Prize winning journalist here out of D.C. with

 2    the Chicago Tribune's D.C. bureau, John Crewdson, in fact

 3    confirms and verifies that that phone call was received and that

 4    the same information was provided to him, an independent party.

 5    So the phone call and the information, the tip was not a figment

 6    of my imagination.

 7              In response to Plaintiffs' allegations that they have

 8    since received death threats, Plaintiffs filed a so-called -- a

 9    copy of an alleged e-mail apparently dated this past September

10    that purported to be from someone based on the book.  When I

11    read the e-mail, I think that it was more situated to the fact

12    that Plaintiffs alleged that they have been defamed by the taint

13    of Sinclair.  However, Mr. Parisi threatened legal action this

14    past September of 2010 if I did not sell LarrySinclair.com to

15    Dan Parisi and that is the way I read that e-mail.

16              And, you know, I apologize but if you want to talk

17    about death threats, you know, e-mail death threats, I have got

18    a case load of them I could bring you.

19              THE COURT:  Hold on to those too.

20              MR. SINCLAIR:  All right.  Thank you, sir.

21              THE COURT: All right. We will stand --

22              MR. OPARIL:  Your Honor, can I just say one --

23              THE COURT:  Well, I usually only let one rebuttal.  So

24    he is the moving party so  we will just leave it at that.

25              MR. OPARIL:  That's fine.

1          THE COURT:  All right, counsel and Mr. Sinclair, we

2    will stand in recess; and I will try to get you a decision as

3    soon as possible.  Thank you very much.

4          (Whereupon, at 12:48 p.m., the proceedings were

5    concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    CERTIFICATE OF REPORTER

2

3         I, Patty A. Gels, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9                                        _____

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25